CRISTALLINA S. A., Appellant, v CHRISTIE, MANSON & WOODS INTERNATIONAL, INC., et al., Respondents.

First Department, May 13, 1986

## APPEARANCES OF COUNSEL

*Robert A. Weiner* of counsel *(Berger, Steingut, Weiner, Fox & Stern,* attorneys), for appellant.

*Alan R. Wentzel* of counsel *(Preben Jensen* and *Linda K. Singer* with him on the brief; *Lane & Mittendorf,* attorneys), for respondents.

## OPINION OF THE COURT

SULLIVAN, J.

At issue is the responsibility, if any, of an auction house to the consignor of works of art for sale at public auction. Cristallina S.A., a Panamanian corporation engaged solely in the purchase and sale of works of art, consigned for sale eight Impressionist paintings to Christie, Manson and Woods International, Inc., the international auction house. The auction was a conceded failure, and as a result Cristallina brought this action against Christie's and its former president, David Bathurst, for monetary redress, including punitive damages. Cristallina claims, *inter alia,* that Christie's and Bathurst intentionally or negligently misrepresented the sum the paintings would bring at auction and failed to advise it of the risks inherent in such a sale. The matter is before us on appeal from a grant of summary judgment dismissing the complaint.

In January 1981, Cristallina, anxious to raise $10,000,000 to purchase additional paintings, contacted Christie's about the possibility of selling several Impressionist paintings that it owned, and a meeting with Bathurst, an expert on Impressionist art, was arranged.

At a February 10, 1981 meeting in Switzerland with Cristallina's representative, Dimitry Jodidio, Bathurst inspected a group of 11 paintings, tentatively appraising the value of each and eventually recommending that 8 of them be put up for sale at a public auction. To demonstrate the advantage of a public auction, Bathurst prepared a memorandum showing what the paintings would obtain at auction as opposed to private sale. According to Jodidio, Bathurst played down the lowest anticipated private sale figure of $7,850,000, as well as the lowest auction estimate $8,500,000, to focus on the high auction gross figure of $12,600,000. On the strength of Bathurst's advice, Jodidio agreed to a public auction and, after subsequent negotiations, Cristallina consigned the eight selected paintings to Christie's for sale in New York City on May 19, 1981. Christie's commission was set at 4%. In the event, however, the total sales did not exceed $9,400,000, Christie's was to forego its commission entirely and accept, instead, a buyer's premium, which would amount to much less. Since it was also agreed that the seller's identity was not to be disclosed, Bathurst was instructed to use code words in referring to Cristallina and Jodidio.[1]

---

1. According to Bathurst, it is not uncommon for a consignor or purchaser of art objects at auction to request anonymity.

Christie's proceeded to advertise and generate curiosity and interest in the sale, designated as "Eight Important Paintings from a Private Collector." It is undisputed that it placed advertisements, solicited and supplied information for articles, directly contacted collectors and compiled a color catalogue of the paintings. It also released sale estimates of possible selling price ranges to the media and the public.

After returning to New York, Bathurst undertook to reach agreement with Jodidio on the reserves[2] which would be set for each of the paintings. Besides monitoring the art market and speaking to other auctioneers, dealers and collectors, Bathurst, in contemplating the reserve prices, also consulted Christopher Burge, the head of Christie's Impressionist paintings department. In his first conversation with Jodidio on the subject on February 23, 1981, Bathurst recommended a reserve totaling $9,300,000, and prepared a memorandum to that effect listing the reserve assigned to each painting. The next day Christie's picked up the eight paintings in Switzerland and shipped them to New York for research and cataloguing. In arranging for insurance, Christie's assigned a specific value to each of the paintings based on Bathurst's appraisals. Jodidio also wrote Bathurst on that day and set forth his understanding of the agreement reached on reserves. Jodidio's reserves matched the insurance values Christie's assigned to the paintings, and exceeded the total of the reserves recommended by Bathurst on February 23rd by $700,000.

Noting the discrepancies in their respective views as to the reserves, Bathurst contacted Jodidio and they agreed that since the auction was still several months away the final setting of reserves would be deferred until just before the auction. As of March, Bathurst still believed that the reserves contained in his February 23rd memorandum were appropriate, but the parties understood that his view of the appropriateness of the reserves was subject to change in the event Christie's concluded that market conditions had changed.

When the paintings arrived in New York in early March, Burge, who had "broadly concurred" with the values placed on them by Bathurst, began his research and cataloguing of them. Although he did not change his view as to their value, he disagreed with Bathurst as to the auction appeal of the

---

2. Reserves, which are never made public and are agreed to by seller and auctioneer, are prices below which an item may not be sold at auction.

selected paintings. Many of the paintings, he believed, irrespective of their true value, would be "difficult" to sell at auction since "a prettier picture will be easier to sell than a tough picture, even though the tough picture is important." For example, Burge considered the Cezanne to be "a tough picture" while Bathurst predicted possible proceeds as high as $3,200,000, a figure which Burge dismissed as "unobtainable". Burge had even less faith in the Morisot and the Van Gogh "Rats", which he dismissed as being "pretty horrible". Burge's concerns were never reported to Jodidio. At the time, the paintings had not been catalogued or a public announcement of the sale made, and thus the sale could have been canceled without the harm to their value which apparently would result if they were withdrawn from sale after they had been catalogued and placed on the public market.

Among Burge's assignments with respect to the auction was the responsibility for advising potential purchasers of the high and low presale estimates for each of the paintings. These estimates reflected Christie's belief as to the range within which the paintings would sell. Christie's quoted presale estimates on May 4, 1981 for seven of the paintings reveal a substantial difference in amounts from the figures quoted to Jodidio by Bathurst on February 10th. On May 4th, just weeks before the auction, the total of the high estimates for the seven paintings (excluding the Monet) was $8,550,000.[3] In contrast, on February 10th, Bathurst had stated that with respect to the same paintings, the high estimates totaled $10,800,000. Moreover, for the same seven paintings, Bathurst had in February recommended reserves totaling $8,500,000—a figure which was barely under the high estimates ($8,550,000) quoted on May 4th.

In giving the low and high presale estimates, Christie's apparently violated its long-standing policy, stated in every catalogue which it published, not to set reserves higher than the announced high presale estimates. For example, in February the Van Gogh "Houses" reserve was initially set at $2,200,000. At Bathurst's recommendation, that reserve was raised on May 18th to $2,300,000. Yet, the high estimate for that painting was only $2,000,000. In other cases, in violation of normal practice, the high estimates and the reserves coin-

---

3. As of May 4th, the lower range of estimates suggested by Christie's for the seven paintings totaled $6,250,000, almost $1,500,000 less than what it stated in February was the lower range.

cided exactly. As Burge noted: "Ideally, reserves should be around 80 percent of our published estimates." No discussion was had with Jodidio about the high and low presale estimates being quoted to the public, nor did Jodidio ever approve any specific high or low presale estimate.

As the May 19th auction date approached, Burge and Bathurst continued to discuss the Cristallina paintings. Burge told Bathurst in early May that the Monet and Cezanne estimates were high. Indeed, according to Burge, he and Bathurst agreed that the $3,200,000 Cezanne estimate quoted to Jodidio "was unobtainable". On May 12, 1981, Christie's public relations officer, who received her information from Burge, wrote to CBS in connection with her promotional activities for the upcoming auction, stating that Christie's expected to receive between $5,000,000 and $9,000,000 for the paintings. Thus, eight days after its May 4th quote setting forth the high and low estimates and only one week before the auction, Christie's was advising the media that the paintings were worth even less than the estimates quoted on May 4th.

Apparently, sometime during the month of May, rumors began to circulate with regard to Jodidio's supposed ownership of the eight paintings. In fact, on May 15, 1981, Jodidio was named in a *New York Times* article as the owner.[4] According to Cristallina, the emergence of Jodidio's name may have given rise to questions about the ownership of the paintings and title thereto. An *International Herald Tribune* article which appeared shortly after the auction stated that the Cristallina sale "appears to have been the object of a hostile rumor campaign reportedly started by one of the world's leading dealers in old and modern masters." While Christie's denies having had any knowledge of these rumors, its denial is at least subject to challenge on the basis of a May 11, 1981 telex from its Geneva office indicating that, on the basis of information obtained from two different clients, Bathurst had notice of the "mystery and the doubts" concerning Cristallina. In any event, Cristallina was never aware of the rumors.

During the period between May 4th and May 18th, according to Bathurst, the public's reaction to the paintings "was quite favorable". Burge confirmed this by testifying that initially "there was considerable interest in a number of the [paintings]." While, ordinarily, this positive public reaction

4. In pertinent part, the article stated: "Several sources in the art trade had reported that the owner of the 'mystery collection' is Dimitry Jodidio".

would cause him to revise the reserves upwards, Bathurst wanted to lower the reserves based on a negative "feeling" he had developed about the outcome of the auction. At his final meeting with Jodidio the day before the auction, Bathurst recommended reserves totaling $9,250,000, which was only $50,000 less than the reserves recommended by him in the February 23rd memorandum. This gross reserve figure was, of course, inconsistent with Christie's prior advice to the media that the paintings would earn between $5,000,000 and $9,000,000 and the fact that the bidding public had already been given, as high presale estimates, figures which were lower than the reserves Bathurst was recommending.

A comparison of the February reserves with the May reserves shows that Bathurst had increased the reserves on both the Gauguin and the Van Gogh "Houses" by $100,000 each. When this was noted at his deposition, he sought to justify the increase on the ground that those two paintings were the ones he "thought would do best."[5] In discussing the reserves at the May 18th meeting, Bathurst did not advise Jodidio that Christie's had publicly announced that the paintings would sell for between $5,000,000 and $9,000,000 or that the recommended reserves, in violation of Christie's own policy, were greater than the high estimates. Not having this information available to him, Jodidio alleges that he agreed to the reserves recommended by Bathurst.

According to Bathurst, he was also given the unilateral right to add to the total reserve of $9,250,000 an additional $150,000 (the "floating reserve"), which he could use to increase the reserves on whichever paintings he felt were appropriate. Jodidio has denied that any agreement was ever reached with respect to the $150,000 floating reserve. The addition of the $150,000 floating reserve not only increased the reserves beyond what they had been in February, but was at odds with Bathurst's stated position that the reserves as of May should be lowered, not increased. When asked why he suggested that there be a floating reserve, Bathurst stated that he "was trying to meet Mr. Jodidio's insistence to obtaining this, as near to this $10,000,000 figure as possible." As even Bathurst conceded, however, an auctioneer does not

---

**5.** The February reserve on the Van Gogh "Houses" exceeded the high presale estimate given for that painting by $200,000. As a result of the reserve agreed to in May it, exceeded the high presale estimate by $300,000.

increase his chances of obtaining better sale results by raising reserves. In his deposition Bathurst testified, "By raising reserves on a specific painting, that increases the chances of the item being bought in."

As matters turned out, Bathurst decided, several hours before the auction, to add the $150,000 floating reserve to two of the paintings. Without advising Cristallina, he increased the reserve on the Gauguin from $1,300,000 to $1,350,000 and the Van Gogh "Houses" from $2,300,000 to $2,400,000.

The sale was held during a week of intensive activity at Christie's and Sotheby's. According to preauction publicity, sale proceeds were expected to equal or surpass the large sums collected in previous sales of this magnitude. Despite extensive publicity, media coverage and a sell-out crowd, the sale went badly. Seven of the eight paintings were not sold. The one painting which was sold, the Degas, fetched a record $2,200,000. The Gauguin was hammered down at $1,300,000, which was the reserve price agreed to by Christie's and Cristallina. Christie's, however, has refused to acknowledge the sale, claiming that because Bathurst had decided to add $50,000 to the reserve, the $1,300,000 bid was below the reserve.

Immediately upon the completion of the auction, Bathurst advised Christie's press office that three paintings had been sold, the Degas, the Gauguin for $1,300,000, and the Van Gogh "Houses" for $2,100,000. Two weeks later, on June 1, 1981, Christie's issued a formal press release, approved by both Bathurst and Burge, confirming these sales. No other press release on the subject has ever been released. Bathurst's explanation for this deception is that it was for "the benefit of [Cristallina] and the art market."

Apparently, changes in the art market were not a factor in the auction's failure. Indeed, as reported in a *New York Times* article dated June 7, 1981, Christie's main competitor, Sotheby's, enjoyed record sales within days of the May 19, 1981 auction and the auction market for that month was as strong as ever.

Cristallina commenced this action in May 1982, asserting eight causes of action grounded in, *inter alia,* fraudulent misrepresentation, negligence, breach of contract, and breach of fiduciary duty. In essence, Cristallina claims that the auction's failure was due to Bathurst's selection of paintings

lacking in auction appeal,[6] the failure to bring vital information to its attention, Christie's advice to the public and the media that the value of the paintings was substantially less than the values given to Jodidio, and the recommendation of reserves in violation of Christie's public policy of not setting reserves higher than the high estimates. In sum, Cristallina contends, Christie's and Bathurst, by their own actions, created an environment which could only lead to failure. Almost one year after the case had been placed on the Trial Calendar, Christie's and Bathurst moved for summary judgment, which Special Term granted. Since we believe that factual issues exist which bar the grant of summary judgment, we reinstate the complaint except for the fifth and seventh causes of action which are based on a failure to remit the sale proceeds from the sale of two of the paintings and the violation of General Business Law § 25, respectively.

Christie's concedes, as it must, that an auction house acts as an agent on behalf of its consignors. The auctioneer is the agent of the consignor. (*City of New York v Union News Co.,* 169 App Div 278, 281; *see,* 7 NY Jur 2d, Auctions and Auctioneers, §§ 9, 28, 32.) As an agent, Christie's had a fiduciary duty to act in the utmost good faith and in the interest of Cristallina, its principal, throughout their relationship. (*Elco Shoe Mfrs. v Sisk,* 260 NY 100, 103; *Matter of Premier Container Corp. [Leinwand],* 95 Misc 2d 859, 866.) When a breach of that duty occurs, the agent is liable for damages caused to the principal, whether the cause of action is based on contract (*see, e.g., Griffin & Evans Cosmetic Mktg. v Madeleine Mono, Ltd.,* 73 AD2d 957; *Jewett v Commonwealth Bond Corp.,* 241 App Div 131, 134, *appeal dismissed* 267 NY 554) or on negligence (*see, e.g., Brown v Poritzky,* 35 AD2d 1007, 1008, *affd* 30 NY2d 289, 292).

Cristallina argues that Christie's and Bathurst withheld information which materially affected its interests. They cite the failure to disclose that Burge strongly disagreed with Bathurst's assessment of the auction appeal of the consigned paintings. Although Burge was of the opinion that they had a value of $10,000,000, he also believed that the paintings would be difficult to sell at auction.[7] Had this information been

---

**6.** According to Bathurst, the three "highest quality paintings" were the Cezanne, the Gauguin and the Van Gogh "Houses". Not one of them, however, was sold.

**7.** In this regard, Christie's may also have violated its duty not to

conveyed to Cristallina, it could have avoided any potential damage by, *inter alia,* withdrawing the paintings from auction prior to their being catalogued. "[A]n agent is subject to a duty to use reasonable efforts to give his principal information which is relevant to affairs entrusted to him and which, as the agent has notice, the principal would desire to have and which can be communicated without violating a superior duty to a third person." (Restatement [Second] of Agency § 381, at 182; *see also, Dickinson v Tysen,* 209 NY 395, 400; *Hyatt v Clark,* 118 NY 563, 569; *Silberkraus v Reinhard,* 221 App Div 615, 617-618; *accord, Feiger v Iral Jewelry,* 52 AD2d 524, 526, *affd* 41 NY2d 928.)

Cristallina also argues that Christie's and Bathurst failed to inform it of the information Christie's released in May 1981 to members of the public and the media shortly before the time Bathurst and Jodidio met to set the final reserves. Christie's, a self-avowed expert, inexplicably advised the public and the media that the values of the paintings were less than what it knew the reserves to be. Besides prejudicing Cristallina, those actions also violated a policy set by Christie's that reserves were not to exceed the high estimates. Based on the public and media disclosures, Christie's and Bathurst knew or should have known that it would be virtually impossible to sell the paintings unless the reserves were lowered. Yet, at his May 18th meeting with Jodidio, Bathurst failed to recommend that the reserves be substantially lowered below those recommended in February. Instead, he recommended that certain of the reserves be increased, which was done, with the result, Cristallina claims, that the paintings were bought in and their value thereby adversely affected.

■ Moreover, where, as here, an agent is selected because of its special fitness for the performance of the duties to be undertaken, the principal is entitled to rely on the agent's judgment and integrity. An agent has an "implied good faith obligation [to] * * * use his best efforts to promote the principal's product" *(Griffin & Evans Cosmetic Mktg. v Madeleine Mono, Ltd.,* 73 AD2d 957, *supra,* citing *Van Valkenburgh, Nooger & Neville v Hayden Pub. Co.,* 30 NY2d 34). While an auctioneer, acting as the agent of an art seller, is not required

attempt the impossible or impracticable, which Restatement (Second) of Agency § 384, at 189, defines as a duty "not to continue to render service which subjects the principal to risk of expense if it reasonably appears to him to be impossible or impracticable for him to accomplish the objects of the principal".

to guarantee the results of a sale or, for that matter, even predict the price that a particular item will bring, he is nonetheless held to a standard of care commensurate with the special skill which is the norm in the locality for that kind of work. Thus, the breach of contract, negligence and breach of fiduciary duty causes of action should not have been dismissed since sufficient has been shown to present a factual question as to whether Christie's and Bathurst acted in a manner commensurate with their skill and expertise.

In support of its cause of action for misrepresentation, Cristallina claims that Bathurst, by placing a value on each of the paintings that he knew was not and could not be true, improperly induced it to agree to a sale of the paintings at public auction. Moreover, Cristallina alleges, Bathurst failed to disclose the risks attendant to such an auction. Had it been made aware of these risks and the paintings' lack of auction appeal, it would never have agreed to a public auction. Christie's and Bathurst argue that the representations as to the estimated value of the eight paintings were mere expressions of opinion and not representations of existing fact.

■ Even assuming that Bathurst, in advising Cristallina as to the value of the paintings and setting reserves, was merely expressing an opinion, which is not actionable (see, Sparman v Keim, 83 NY 246, 249; Banner v Lyon & Healy, 249 App Div 569, affd 277 NY 570), rather than a representation as to an existing fact, which is (see, Margrove, Inc. v Lincoln First Bank, 54 AD2d 1105; see generally, International Prods. Co. v Erie R. R. Co., 244 NY 331), he had an obligation to render such opinion truthfully. Thus, his selection of eight paintings, many of which, according to Burge, would be difficult, if not impossible, to sell and the dissemination of estimates at variance with the reserves and his earlier predictions, raise serious questions as to whether Bathurst misrepresented the prices which could be obtained at public auction. Statements of value can, in certain circumstances, be regarded as a representation of existing fact. (Hickey v Morrell, 102 NY 454, 463; Simar v Canaday, 53 NY 298, 306-307 [statements as to value of land constituted actionable misrepresentation]; Gross v State Cooperage Export Crating & Shipping Co., 32 AD2d 540 [under certain circumstances an expression of opinion, including an estimate, may be actionable].) An expression or prediction as to some future event, known by the author to be false or made despite the anticipation that the event will not occur, "is deemed a statement of a material existing fact, sufficient

to support a fraud action." *(Channel Master Corp. v Aluminium Ltd. Sales,* 4 NY2d 403, 407; *Chase Manhattan Bank v Perla,* 65 AD2d 207, 210.)

■ As further justification for its dismissal of the complaint, Special Term, citing the failure to present any expert affidavit as to the paintings' present value, found that Cristallina's claim for damages was speculative. The paintings' preauction value may, of course, be established by estimates, including Bathurst's, and the value Christie's placed on them for insurance purposes. The measure of damages is the difference between the paintings' preauction value and their value after the auction. *(See, e.g., French Evangelical Church v Borst,* 22 AD2d 511, 513.) Appraisals and bona fide sales are indicative of value and may serve as the basis of a damage award. *(Matter of Rothko,* 43 NY2d 305, 322-323.) As the record discloses, four of the paintings have been sold since the auction, three in September 1982 and another, the Gauguin, in 1984, at significantly less than Bathurst's preauction appraisal figures. In each case, Cristallina advised Christie's of the offer and afforded it the opportunity to match or better it. In any event, "the difficulty of ascertaining damages does not excuse their determination". *(Tobin v Union News Co.,* 18 AD2d 243, 245, *affd* 13 NY2d 1155.) While damages may not be determined by mere speculation or guess, evidence that, "as a matter of just and reasonable inference", shows their existence and the extent thereof will suffice, even though the result is only an approximation. *(Story Parchment Co. v Paterson Co.,* 282 US 555, 563.)

■ Cristallina's claim for punitive damages, stated not as a separate cause of action but as part of the ad damnum clause, also should stand at this stage of the litigation. The complaint pleads the requisite allegations of recklessness and conscious disregard of Cristallina's rights. *(See, Hartford Acc. & Indem. Co. v Village of Hempstead,* 48 NY2d 218, 227.) Whether the alleged misconduct warrants the imposition of a punitive damage award should, in the circumstances, be left for the trier of the facts. *(Nardelli v Stamberg,* 44 NY2d 500, 503.) Cristallina argues that punitive damages are particularly appropriate in this case since "the business of an auctioneer * * * has always been affected with a public interest". *(Biddles, Inc. v Enright,* 239 NY 354, 365.) In further support of the punitive damage claim, Cristallina cites the entry of a consent judgment between the New York City Consumer Affairs Department and Christie's in connection with the

issuance of the false press release for violations of Administrative Code § B32-149.0.[8] Christie's was fined $80,000 and Burge's and Bathurst's auction licenses were suspended.

■ We agree with Special Term's determination that the fifth and seventh causes of action, which we are not reinstating, are fatally defective. In the fifth cause of action Cristallina claims entitlement to $3,610,000, the purported purchase price of the two paintings falsely listed as sold in Christie's press release. Cristallina has no claim, legal or equitable, to the proceeds of these spurious sales. The two paintings were returned to it and eventually sold. Thus, it cannot show that the paintings were rendered worthless as a result of the false representation. As already indicated, its damages are limited to the loss in value allegedly incurred as a result of Christie's and Bathurst's wrongdoing, if any, and that damage claim is preserved in the other causes of action.

The seventh cause of action, claiming a violation of General Business Law § 25, which sets forth the type of records required to be maintained by an auctioneer, is based on Christie's failure to record the two false sales in its records as actual sales. Aside from its obvious lack of merit and even assuming, arguendo, that section 25 created a private right of action for damages, an issue we need not reach, it is clear to us that any such violation as might have occurred here did not cause Cristallina to suffer any damages.

Accordingly, the order of the Supreme Court, New York County (Eugene R. Wolin, J.), entered July 15, 1985, granting defendants' motion for summary judgment dismissing the complaint should be modified, on the law, to deny the motion as to the first, second, third, fourth, sixth and eighth causes of action, and, except as thus modified, affirmed, without costs or disbursements.

MURPHY, P. J., ROSS, CARRO and FEIN, JJ., concur.

Order, Supreme Court, New York County, entered on July 15, 1985, unanimously modified, on the law, to deny the

---

8. Section B32-149.0 provides: "False or fraudulent representations; damages.-a. Any auctioneer who shall have knowledge of any false or fraudulent representations or statements or who makes or causes any such statements to be made in respect to the character of any sale, or the party authorizing the same, or the quality, condition, ownership, situation, or value of any property, real or personal, exposed, put up, or offered by him for sale at public auction, shall be deemed guilty of a misdemeanor, and, upon conviction thereof, shall be punished by imprisonment and not exceeding one year or by a fine not exceeding one thousand dollars."

motion as to the first, second, third, fourth, sixth and eighth causes of action, and, except as thus modified, affirmed, without costs and without disbursements.