Gene SIMMS, Simms–Vona Limited Partnership, Carlo Vona, Plaintiffs,

v.

George BIONDO, Perry Duryea, Jr., David Webb, Thomas Carusona, Toni Dileo, Eastern Federal Savings and Loan Association, Resolution Trust Corporation as Receiver of Eastern Federal Savings and Loan Association, James Donelan, Defendants,

The Connecticut National Bank, Additional Counterclaim Defendant.

No. 90–CV–3184 (JRB).

United States District Court, E.D. New York.

Feb. 26, 1993.

James J. Farrell, Norwalk, CT, for plaintiffs.

Berger, Steingut, Tarnoff & Stern, New York City (Charles S. Webb III, Allison Walsh, of counsel), for defendants George Biondo, Perry Duryea, Jr., and David Webb.

Rivkin, Radler & Kremer, Uniondale, NY (Michael C. Marsh, of counsel), for defendant Resolution Trust Corp.

## MEMORANDUM–DECISION AND ORDER

BARTELS, District Judge.

### I. BACKGROUND

On September 16, 1987, plaintiffs Gene Simms, Carlo Vona and Simms–Vona Partnership ("Buyers") entered into a contract of sale ("Contract of Sale") to purchase 42.5 acres of land in Shelter Island, New York ("Overlook I"), for $3.1 million from defendants George Biondo, Perry Duryea, Jr., and David Webb ("Sellers"). Shelter Island lies in Gardiner's Bay between the north and south forks of Long Island. Overlook I is located in the north part of Shelter Island and consists of 18 parcels subdivided for the construction of luxury homes. Defendants Thomas Carusona and Toni DiLeo were the Sellers' brokers ("Brokers"). On December 18, 1987, Buyers and defendant Eastern Federal Savings and Loan Association ("Eastern") entered into a mortgage loan commitment ("Mortgage Loan Commitment") for $2.17 million in order to finance the purchase. On March 16, 1988, Buyers borrowed $2.17 million from Eastern by executing a note ("Note") and mortgage ("Mortgage"), and title to Overlook I was transferred. On the same day, Sellers and Eastern entered into a participation agreement ("Participation Agreement") whereby Sellers purchased a $170,000 interest in the Mortgage. Defendant James Donelan, then Senior Vice President at Eastern, represented Eastern in the Overlook I transaction.

Buyers defaulted on the Note and Mortgage beginning in March, 1990. On May 2, 1990, Buyers and Eastern modified the terms and time of payment on the Note and Mortgage through an extension agreement ("Extension Agreement"), but the default was not cured.[1] On September 12, 1990, Buyers initiated this diversity action. On September 27, 1991, Eastern was declared insolvent, closed and placed under the receivership of the Resolution Trust Corporation ("RTC") pursuant to the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub.L. 101–73, 103 Stat. 183 (August 9, 1989), codified in Titles 12 and 15 of the United States Code. The RTC replaced Eastern as defendant in this lawsuit pursuant to 12 U.S.C. §§ 1441a(b) and 1821(d)(2). The lawsuit was then stayed 180 days pending RTC administrative review as required under FIRREA. Simms v. Biondo, 785 F.Supp. 322 (E.D.N.Y.1992). The RTC denied Buyers' notice of claim.

The Buyers' Amended Complaint alleges six causes of action. Count I alleges fraud against Sellers, Brokers, Eastern and Done-

---

**1.** As of January 1, 1991, Buyers were indebted to Eastern under the Note, Mortgage and Extension Agreement in the amount of $2,262,477.64, plus interest.

lan in the following three ways: [1] Sellers and Brokers misrepresented the value of Overlook I by telling them during negotiations that it was worth approximately $4 million, while knowing at the time that its actual market value was between $1.5 million and $1.6 million; [2] Sellers misrepresented the value of Overlook I by giving to them a copy of an appraisal made by Peter N. Davidson Co. ("Davidson Appraisal"), dated March 26, 1987, which contained an error; and [3] Donelan misrepresented to Simms in December 1987 that Overlook I was worth at least $3.155 million.

Count II alleges fraudulent inducement against the Sellers and Brokers based on their false and misleading representations concerning the value of Overlook I and the error in the Davidson Appraisal. Count III alleges negligent misrepresentation as to value against Sellers, Brokers and Eastern based on the above-described events in Count I. Count IV seeks rescission or reformation of the Contract of Sale. Count V alleges breach of contract against Eastern. The Buyers allege here that they entered into an appraisal contract with Eastern ("Eastern Appraisal Contract") in which Eastern "impliedly represented" [sic] that it would produce an "objective and competent" appraisal of Overlook I. Amend.Com. ¶ 39, 75. Count V alleges breach of the Eastern Appraisal Contract in the following two ways: [1] by misrepresenting the value of Overlook I in the resulting appraisal made by Eastern ("Eastern Appraisal"), dated December 15, 1987, at $3.155 million; and [2] by entering into the Participation Agreement without disclosing it to the Buyers. Count VI alleges that Sellers induced breach of the Eastern Appraisal Contract. Buyers claim that their mortgage broker, Richard Winters, secretly worked on behalf of the Sellers and improperly influenced Eastern in its preparation of the Eastern Appraisal.

All defendants deny these allegations. RTC counterclaims for foreclosure on the Note, Mortgage and Extension Agreement. Buyers defend against foreclosure by raising affirmative defenses of fraud, misrepresentation, oppressive and unconscionable conduct, equitable estoppel, illegality, and bad faith predicated on the above-described allegations in the Amended Complaint. Sellers, broker Carusona, and the RTC now move for summary judgment on the Amended Complaint pursuant to Fed.R.Civ.P. 56. The RTC also now moves for summary judgment on its counterclaim for foreclosure.

## II. DISCUSSION

Summary judgment is proper only when, "viewing the facts in the light most favorable to the nonmovant, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *United States v. One Parcel of Real Property,* 985 F.2d 70, 72 (2d Cir.1993). The court must resolve all ambiguities and draw all doubtful inferences against the moving party. *Trans–Orient Marine Corp. v. Star Trading & Marine, Inc.,* 925 F.2d 566, 572 (2d Cir.1991). "In order to defeat a properly supported motion for summary judgment, the nonmoving party must adduce sufficient evidence to permit a reasonable jury to return a verdict in his favor." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992). The Court will apply these summary judgment standards in Part A below to Sellers' and broker Carusona's motions on the Amended Complaint brought under New York law, in Part B below to RTC's motion on the Amended Complaint brought under federal law, and in Part C below to RTC's motion on its counterclaim for foreclosure brought under New York law.

### A. Sellers' and Carusona's Motions for Summary Judgment On the Amended Complaint

#### 1. Counts I and II: Fraud and Fraudulent Inducement

The essence of this case is Buyers' claims in Count I and II that Sellers' and Carusona's opinion valuing Overlook I at $4 million was fraudulent. The long-established rule in New York is that statements concerning the value of real property are generally not actionable under a theory of fraud or fraudulent inducement. *Ellis v. Andrews,* 56 N.Y. 83, 85–87 (1874); *Brang v. Stachnik,* 235 App.Div. 591, 257 N.Y.S. 671, 672 (1st Dept.1932), *aff'd* 261 N.Y. 614, 185 N.E. 761

(1933); *Seis v. Plaisantin*, 52 App.Div. 206, 65 N.Y.S. 70, 71–72 (2d Dept.1900) ("it is well settled that a false statement as to the value of property, made by a vendor for the purpose of obtaining a higher price than he knows the property is worth, will not sustain an action for fraud by a purchaser who contracted for the purchase in reliance upon such statement; that the purchaser must rely upon his own judgment as to value, and that it is folly to rely upon the representation of the vendor in that respect"); *see also Augsbury v. Adams*, 135 A.D.2d 941, 522 N.Y.S.2d 691, 692 (3d Dept.1987) (applying the above-stated rule to the purchase of chattels); 60 N.Y.Jur.2d, *Fraud and Deceit* § 72 (1987). This rule is explained in two ways. First, representations as to value alone are generally matters of opinion upon which no detrimental reliance can occur. *Id.* Second, the doctrine of *caveat emptor* applies to real estate transactions such that a buyer has a duty to satisfy himself or herself of the quality of a bargained purchase price without trusting a seller. *See Stambovsky v. Ackley*, 169 A.D.2d 254, 572 N.Y.S.2d 672, 675–76 (1st Dept.1991); *London v. Courduff*, 141 A.D.2d 803, 529 N.Y.S.2d 874, 875 (1st Dept.), *app. dismissed without op.*, 73 N.Y.2d 809, 537 N.Y.S.2d 494, 534 N.E.2d 332 (1988).

■■■ Nevertheless, there are exceptions where "[s]tatements of value can, in certain circumstances, be regarded as a representation of existing fact...." which are actionable as fraud. *Cristallina S.A. v. Christie, Manson & Woods Intern., Inc.*, 117 A.D.2d 284, 502 N.Y.S.2d 165, 172–73 (1st Dept. 1986); 60 N.Y.Jur.2d, *Fraud and Deceit* § 73 (1987). In the instant case, Buyers rely heavily on one such exception, *Merry Realty Co. v. Martin*, 103 Misc. 9, 169 N.Y.S. 696 (Sup.Ct. Kings Cty.1918), *aff'd sub. nom. Merry Realty Co. v. Shamokin & Hollis Real Estate Co.*, 186 App.Div. 538, 174 N.Y.S. 627 (2d Dept.1919), *rev'd on other grounds*, 230 N.Y. 316, 130 N.E. 306 (1921). In *Merry Realty*, the owners of an apartment building in Brooklyn, New York tricked Pennsylvania buyers by telling them that they were not the owners, but brokers who could render a disinterested expert opinion on the value of the building. The owners employed a dummy seller and fake deeds of sale to make the ruse successful. Buyers unwittingly told these phony brokers that they knew nothing about real estate values in Brooklyn and would rely on their expert opinion. The owners then provided buyers with a greatly inflated value estimate. *Merry Realty*, 169 N.Y.S. at 697. The trial court's decision to render a judgment against the owners based on the buyers' accusation of fraud as to value was affirmed. *Merry Realty*, 174 N.Y.S. at 629, *aff'd*, 230 N.Y. at 319, 130 N.E. 306.

The inapplicability of *Merry Realty* to the instant case is obvious but must be explained in light of the Buyer's heavy reliance on it. Buyers have produced no evidence showing any scheme of deception by the Sellers or Carusona designed to trick the Buyers about the value of Overlook I. Nor have Buyers produced any evidence showing that Sellers or Carusona falsely claimed that they were disinterested experts on local real estate values. Finally, while the *Merry Realty* buyers fell victim to the owners' deceptions in part because they knew nothing about Brooklyn real estate values, the Buyers claim of ignorance about Long Island real estate values is simply frivolous. Simms, who acted as Buyers' exclusive representative in the Overlook I transaction, admitted during discovery proceedings that he is a highly experienced real estate developer of commercial and residential properties in the New York metropolitan area.[2] He has "been building for about 30 years," including the construction of "in excess of 300 homes," "two dozen subdivisions," "more than 1500 condominium units," "several strip shopping centers," and an unspecified number of garden apartments. Sellers' Ex. A, Simms Dep. I, 23, 181; Ex. E. He describes specific experience in the Long Island real estate market including work on "a very large subdivision" near Far Rockaway, New York (Long Island), and "at least half a dozen" negotiations with banks on Long Island for financing. Sellers' Supp.Ex. A, Simms Dep. 199–200. Buyers cannot now

---

**2.** Similarly, Vona states in his resume submitted to Eastern as a condition of the Mortgage Loan Commitment that he "successfully purchased, subdevided, [sic] developed, and sold real estate in the New York and Connecticut area." Sellers' Ex. E.

pretend that they were newcomers to the Long Island real estate market.

Simms also conducted what he considered to be a full investigation of Overlook I before entering into the Contract of Sale. Sellers' Ex. A., Simms Dep. III, 384; Ex. H, ¶ 22. Simms inquired about Shelter Island's size, population, seasonal community, businesses and ferry service. Sellers' Ex. A, Simms Dep. I, 119. He visited Overlook I, Overlook II and other comparable lots on Shelter Island. Sellers' Ex. A, Simms Dep. I, 132, Simms Dep. II, 161–165, 170–72. He received copies of deeds of sale from Overlook II. Sellers' Ex. C, Engstrom Dep. I, 47; Ex. K. Simms' employee, Karen Engstrom, went to Shelter Island Town Hall, researched comparable land sales prices by examining public records, and reported her findings to him. Sellers' Ex. A, Simms Dep. II, 142; Ex. C, Engstrom Dep. I, 22–24, 47–53, II, 282–90, 292, III, 131–32; Ex. F; Supp. Ex. 1, DiLeo Dep. 165, 407–09; Supp.Ex. A, Simms Dep. 119–20. She visited Overlook I for Simms. Sellers' Ex. C, Engstrom Dep. I, 22. Engstrom, accompanied by DiLeo, also visited "every" real estate broker on Shelter Island, inquired about land values and reported her findings to Simms. Sellers' Ex. A., Simms Dep. I, 168, III, 341–42; Supp. Ex. 1, DiLeo Dep. 21–4, 30–32, 165, 407–09. Simms testified that he saw information compiled by Engstrom and DiLeo indicating that comparable undeveloped lots near Overlook I had recently sold for prices ranging from $170,000 to $180,000, and less proximate lots on Shelter Island for as much as $250,000 each.[3] Sellers' Ex. A, Simms Dep. III, 341–42. Simms further admitted that he relied on this information prior to entering into the Contract of Sale. Sellers' Ex. A, Simms Dep. III, 341–42, 384. There can be no dispute that Buyers were very well informed about Shelter Island real estate values by the time they purchased Overlook I.

Buyers' last effort to stave off summary judgment on their fraud and fraudulent inducement claims is to rely on a quotation from *Simar v. Canaday*, 53 N.Y. 298, 307 (1873), which reads, "[w]hether a representation as to the value ... [of real property].... is merely an expression of belief, or an affirmation of a fact to be relied upon, is a question for the jury." In *Simar*, the court decided that the question of fraud as to value should have been left to a jury because *inter alia* the seller deceived buyers by inducing them to forbear from making inquiries into the farm which they purchased and also by making false representations about the condition of the farmland. *Id.* at 306; *see Chrysler v. Canaday*, 90 N.Y. 272, 277 (1882). Subsequent opinions by the New York Court of Appeals explaining *Simar* make it clear that the rules announced in *Simar* must be understood in light of its exceptional facts. *Chrysler*, 90 N.Y. at 276–79; *Ellis*, 56 N.Y. at 83 (footnote). Thus, the above-cited quotation from *Simar* is not a rule of general applicability, but a statement limited to the exceptional facts of that case. This is the only sensible interpretation of *Simar* because otherwise every allegation of fraud as to value would be required to go to a jury and thereby nullify the general New York rule concerning the matter. *Simar* is also factually distinguishable from the instant case because Buyers never alleged that Sellers or Carusona induced them to forbear from making an investigation into Overlook I, nor could they fairly so allege in view of the detailed investigation which occurred. In the final analysis, whatever prices Sellers or Carusona proposed to Buyers as they negotiated for the sale of Overlook I are not actionable as a matter of law.

Even if Sellers' and Carusona's opinions as to value were actionable, summary judgment is appropriate. The claim that Buyers relied completely on Sellers' and Carusona's representations on the value of Overlook I is completely belied by their investigation into the property and its environs. Buyers also purchased Overlook I for $3.1 million, which is approximately $900,000 less than the allegedly fraudulent $4 million estimate. How Buyers relied on the Sellers' and Carusona's representations is beyond comprehension in light of the facts and circumstances of this

---

**3.** The Court notes that Buyers purchased the 18 lots which comprise Overlook I for a price averaging $172,222.22 per lot.

case. The claims of fraud and fraudulent inducement as to value lack factual basis and are unsupported by the record.

■ The next allegation leveled against the Sellers in Count I is that they defrauded the Buyers by showing them the Davidson Appraisal which contained an error.[4] The alleged error concerns the sales price of a comparable undeveloped lot in an adjacent subdivision known as Overlook II. The lot had been sold by Sellers to James and Elizabeth Schmale. The Davidson appraisal stated that the Schmale property at Overlook II was sold for $178,500 when public documents recorded at Shelter Island Town Hall indicate that the purchase price was $110,000. The Buyers allege that the Sellers knew or should have known about this error because Sellers sold the property to Schmale. There is no basis for holding the Sellers or Carusona liable because they neither wrote the Davidson Appraisal nor vouched for its authenticity. *Vitale v. Coyne Realty, Inc.*, 66 A.D.2d 562, 414 N.Y.S.2d 388, 393 (4th Dept. 1979).

■ Even assuming that the error could be imputed to Sellers or Carusona, the claim is baseless. The purchase price of the Schmale property was and is ascertainable by inspecting public records located at the Shelter Island Town Hall. Facts which are accessible as a matter of public record bar a claim of justifiable reliance necessary to sustain a cause of action for fraud. *Grumman Allied Industries, Inc. v. Rohr Industries, Inc.*, 748 F.2d 729, 737 (2d Cir.1984); *Danann Realty Corp. v. Harris*, 5 N.Y.S.2d 317, 184 N.Y.S.2d 599, 603, 157 N.E.2d 597, 601 (1959); *Most v. Monti*, 91 A.D.2d 606, 456 N.Y.S.2d 427, 428 (2d Dept.1982). It is undisputed that Engstrom checked the sales price of the Schmale property during her review of public documents at Shelter Island Town Hall, discovered the error in the Davidson Appraisal, noted it on Simms' copy, and informed Simms about it prior to the

purchase. Sellers' Ex. A, Simms Dep. II, 142, Ex. C, Engstrom Dep. I, 22–24, 47–53, II, 282–90, 292, III, 131–32; Ex. F; Supp. Ex. 1, DiLeo Dep. 165, 407–09; Supp. Ex. A, Simms Dep. 119–20. There cannot possibly be justifiable reliance on the error when it was both available as a matter of public record and discovered by and known to Buyers. This claim, which is of dubious relevance in the first place, has no legal or factual basis.

■ Buyers finally reference a May 20, 1985 appraisal of Overlook I apparently prepared by Sal Termini ("Termini Appraisal") for Biondo, which valued the site at $2.14 million. Buyers' Local Rule 3(g) Statement, ¶ 63; Buyers' Opp.Mem.L. at 8. Buyers contend that Biondo should have but did not show it to them. This document was not produced by Buyers and consequently cannot support their opposition to the instant motions. Even if the Termini Appraisal were properly submitted before this Court, it does not support a claim of fraud or fraudulent inducement because the Sellers had no obligation to show it to Buyers. *See Grumman*, 748 F.2d at 738–39.

As a postscript, the Court notes that the Termini Appraisal antedates the Overlook I transaction by more than two years. As Simms noted, "[i]f you look at the overall market in the northeast quarter, especially in the Connecticut/New York areas, any you saw what happened with property from '85 to mid-'87, the appreciation of property accelerated at a tremendous rate, 20, 25 percent in some cases, 50 percent in some cases on an annual basis." Sellers' Ex. A, Simms Dep. I, 126–27. If the 1985 Termini estimate were revised according to Simms' 20% annual appreciation rate, it would yield a 1987 appraised value of $3.081 million—an amount just shy of the Buyer's actual 1987 $3.1 million purchase price. This is yet another example of the lack of correspondence between the Buyer's accusations of foul play in the

---

4. The Davidson Appraisal was prepared for William Birnes. Birnes never paid for it and Peter Davidson subsequently gave a copy to Biondo. Biondo then gave a copy to Simms. Biondo later, without solicitation, paid Davidson approximately $1,700.00 for use of the Davidson Appraisal. Despite Buyers' protestations to the contrary, whatever motivated Biondo to pay Davidson has no bearing on this case because it occurred well after the appraisal was prepared for a disinterested third party.

Overlook I transaction and the actual facts surrounding the purchase.

### 2. *Count III: Negligent Misrepresentation*

In Count III, Buyers combine the above-described allegations in Count I as the predicate for a claim of negligent misrepresentation against Sellers and Carusona. The Contract of Sale, Paragraph 22, states,

> [a]ll prior understandings and agreements between seller and purchaser are merged in their contract. It completely expresses their full agreement. It has been entered into *after full investigation,* neither party relying upon any statements made by anyone else that is not set forth in this contract. Sellers' Ex. H. [emphasis added]

This "merger" clause bars a claim for negligent misrepresentation as a matter of law. *Chase Manhattan Bank, N.A. v. Edwards,* 87 A.D.2d 935, 450 N.Y.S.2d 76, 78 (3d Dept. 1982), *aff'd* 59 N.Y.2d 817, 464 N.Y.S.2d 739, 451 N.E.2d 486 (1983); *Dorsey Products Corp. v. United States Rubber Co.,* 21 A.D.2d 866, 251 N.Y.S.2d 311, 313 (1st Dept.1964), *aff'd* 16 N.Y.2d 925, 264 N.Y.S.2d 917, 212 N.E.2d 435 (1965). Even if the merger clause does not bar this claim, it is defective. A cause of action for negligent misrepresentation is valid only if the "parties' relationship suggests a closer degree of trust and reliance than that of the ordinary buyer and seller." *American Protein Corp. v. AB Volvo,* 844 F.2d 56, 63 (2d Cir.), *cert. denied* 488 U.S. 852, 109 S.Ct. 136, 102 L.Ed.2d 109 (1988), quoting *Coolite Corp. v. American Cyanamid Co.,* 52 A.D.2d 486, 384 N.Y.S.2d 808, 811 (1st Dept.1976). Buyers have not even alleged the existence of a special relationship with Sellers or Carusona and consequently the claim must fail. *American Protein,* 844 F.2d at 64.

### 3. *Count VI: Inducement of Breach of Eastern Appraisal Contract*

Sellers next dispute the sufficiency of Count VI, in which Buyers allege that Sellers induced breach of the Eastern Appraisal Contract. Buyers allege that Richard Winters, their mortgage broker, secretly worked on behalf of Sellers and somehow influenced Eastern to prepare an inflated value estimate in the Eastern Appraisal. Even assuming that the Eastern Appraisal Contract existed, the claim that the Sellers' alleged inducement through Winters "caused Plaintiffs to bid and pay a higher price than that which they would have bid and paid absent the fraudulent inducement...." is absurd. Amend.Com. ¶ 83. Buyers entered into the Contract of Sale for $3.1 million approximately three months before Eastern produced the Eastern Appraisal which valued Overlook I at $3.155 million. Buyers could not have been caused to pay a greater amount than they otherwise would have because at the time of the alleged breach of the Eastern Appraisal Contract they were already bound by the purchase price in the Contract of Sale. Moreover, Richard Winters was not even engaged as Buyers' agent until after the Contract of Sale was signed. *See* Sellers' Supp. Ex. B.

Buyers next claim that had they known about the Participation Agreement between Sellers and Eastern, they would not have purchased Overlook I. Buyers have failed to establish the source of the duty through which Sellers or Carusona were required to notify the Buyers about the Participation Agreement. The Participation Agreement was independent and apart from any legal relationship between the Sellers and Buyers and consequently this claim must fail as a matter of law.

Finally, Buyers assert that the alleged failure to disclose the Participation Agreement violated the Contract of Sale, Rider A, Paragraph 8, which required the Buyers to make all reasonable efforts to obtain a commitment for a "Conventional Mortgage" with a bank. Sellers' Ex. H. This claim is spurious. A conventional mortgage is defined as "a contract by which a person binds the whole of his property ... in favor of another, to secure the execution of some engagement, but without divesting himself of possession." *Black's Law Dictionary* 911 (5th ed. 1979). Obviously, Buyers secured a conventional mortgage through the Mortgage Loan Commitment, and gave a conventional mortgage through the Mortgage itself, or otherwise title to Overlook I never would have been transferred. Simms has conceded

as much. Sellers Supp. Aff. Ex. A, Simms Dep. I, 187–194. This claim, like all the others brought by Buyers against Sellers and Carusona, is defective as a matter of law and presents no issues of fact. Consequently, summary judgment is hereby granted to Sellers and Carusona on Counts I, II, III, IV, and VI of the Amended Complaint.

### B. RTC's Motion for Summary Judgment on the Amended Complaint

#### 1. Counts I and III: Fraud and Negligent Misrepresentation

Counts I and III against Eastern are based upon an alleged oral representation made by Donelan to Simms in December 1987 to the effect that Overlook I was worth at least $3.155 million. The RTC contends that 12 U.S.C. § 1823(e) and § 1821(d)(9)(A), which are both part of FIRREA, bar these claims because they turn on an "agreement" inducing the signing of the Note and Mortgage which must be, but was not, in writing, executed by Eastern, approved by the Eastern Board of Directors, and has been since that time an official record of Eastern.[5]

 Buyers resist the application of § 1823(e) on three grounds. First, they contend that the RTC lacks standing to invoke § 1823(e). 12 U.S.C. § 1441a(b)(4)(A) specifically empowers the RTC to utilize the provisions of § 1821 and § 1823. Second, Buyers claim that § 1823(e) and § 1821(d)(9)(A) cannot apply retroactively to the purchase of Overlook I because it occurred prior to the enactment of FIRREA. This retroactivity argument is baseless because the lawsuit commenced more than one year after FIRREA became law. Moreover, Buyers implic-

itly conceded the applicability of FIRREA in their successful opposition to the RTC's motion to dismiss. See Simms, 785 F.Supp. at 324. Third, Buyers assert that § 1823(e) does not apply because Donelan's representation concerning the value of Overlook I is not an agreement as defined therein. In Langley v. FDIC, 484 U.S. 86, 93, 108 S.Ct. 396, 402, 98 L.Ed.2d 340 (1987), a unanimous Supreme Court held that a representation by a bank as to the "truthfulness of a warranted fact" is an agreement which must conform to the requirements of § 1823(e). Under Langley, Donelan's representation about the value of Overlook I qualifies as a § 1823(e) agreement and consequently Counts I and II are invalid as a matter of law. See also FDIC v. Bernstein, 944 F.2d 101, 108 (2d Cir.1991) ("Section 1823(e) ... has been interpreted to prohibit the assertion against the ... [RTC] ... of bank misrepresentations inducing the execution of a note and guaranty").

 Buyers also assert that Eastern's failure to disclose that it entered into the Participation Agreement with the Sellers constitutes fraud in the factum on the Note and Mortgage because these documents do not indicate that Sellers were "lenders" along with Eastern. This claim is untimely and baseless. Fraud in the factum is the "sort of fraud that procures a party's signature to an instrument without knowledge of its true nature or contents." Langley, 484 U.S. at 93, 108 S.Ct. at 402; see also N.Y. Uniform Commercial Code § 3–305(2)(c), Comment 7 (McKinney's 1991). If present, fraud in the factum "would take the instrument[s] out of § 1823(e), because it would render the instrument[s] entirely void...." Langley, 484 U.S. at 93, 108 S.Ct. at 402. The Note and

---

**5.** § 1823(e), enacted as § 217(4) of FIRREA, provides:

(e) Agreements against interests of Corporation [RTC]

No agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement—

(1) is in writing,

(2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contempora-

neously with the acquisition of the asset by the depository institution,

(3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and

(4) has been, continuously, from the time of its execution, an official record of the depository institution.

§ 1821(d)(9)(A), enacted as § 212(d)(9) of FIRREA, provides, in pertinent part:

..... any agreement which does not meet the requirements set forth in § 1823(e) shall not form the basis of, or substantially comprise a claim against the receiver or the Corporation.

Mortgage correctly state that Eastern is the sole payee and mortgagee, respectively. The Participation Agreement is "typical" in that the participants (Sellers) purchased an unsecured interest in a loan and have no recourse as a creditor of the borrowers (Buyers). *Hibernia Nat. Bank v. FDIC*, 733 F.2d 1403, 1407 (10th Cir.1984); *see* G. Nelson and D. Whitman, *Real Estate Finance Law* § 5.35 (2d ed. 1985). There can be no fraud in the factum because the identification of Eastern in the Note and Mortgage as the exclusive lender is accurate.[6]

### 2. *Count V: Breach of Eastern Appraisal Contract*

The next part of the motion brought by RTC concerns the validity of Count V, in which Buyers allege that Eastern breached the Eastern Appraisal Contract. Count V is without merit because the alleged Eastern Appraisal Contract was an oral agreement between Donelan and Simms which does not satisfy any of the requirements of § 1823(e). Perhaps anticipating this conclusion, Buyers have recrafted Count V in order to circumvent the requirements of § 1823(e) by arguing that the Eastern Appraisal Contract was written and recorded in the Eastern files as part of the Mortgage Loan Commitment. This revision is untimely and without merit. The Mortgage Loan Commitment states that one of the items "required at closing" from Buyers is "$750.00 additional ... for credit and appraisal." Buyers' Ex. A. This condition does not create an appraisal contract but merely signifies an expense passed along to the Buyers from Eastern in order to cover the costs of producing the Eastern Appraisal. Consequently, summary judgment for RTC is hereby granted on Counts I, III and V of the Amended Complaint.

### C. *RTC's Motion for Summary Judgment on its Counterclaim for Foreclosure*

Finally, RTC moves for summary judgment on its foreclosure counterclaim. Buy-

ers defend against this counterclaim by raising affirmative defenses under New York law predicated on their affirmative claims. The above-stated reasoning justifies the conclusion that there are no valid defenses under federal or New York law. Summary judgment is hereby granted in favor of RTC on its counterclaim for foreclosure.

## III. CONCLUSIONS

The Court has carefully considered the merits of the defendant Sellers', Carusona's and RTC's motions for summary judgment on the Amended Complaint, and for the reasons stated above, they are hereby GRANTED. Defendant RTC's motion for summary judgment on its counterclaim for foreclosure on the Note, Mortgage, and Extension Agreement is hereby GRANTED. Costs are hereby taxed against plaintiff Buyers pursuant to 28 U.S.C. § 1920.

SO ORDERED.

---

6. The Court notes that Office of the Comptroller of the Currency policy guideline, Banking Circular 181, directs that "all documentation" of a loan in which participation interests are sold must be "drafted in the name of the selling bank." Office of the Comptroller of the Curren-

cy, Banking Circular 181 (Rev. Aug. 2, 1984). While Banking Circular 181 was inapplicable to Eastern because it was not a national bank, Eastern's documentation of the loan conforms with this federal standard.