**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**David F. BROWN, Tore T. DeBella, Richard A. Reizen, Robert F. Ehrling, Defendants–Appellants.**

**No. 93–4063.**

United States Court of Appeals,
Eleventh Circuit.

April 16, 1996.

---

Benedict P. Kuehne, Jon A. Sale, Miami, FL, Robert B. Fiske, Jr. and Carey R. Dunne, Davis Polk Wardwell, New York City, and Steven M. Edwards, Davis, Scott, Weber & Edwards, New York City, for David Brown.

Clark Mervis, Miami, FL, for Tore T. De-Bella.

Richard Sharpstein, Miami, FL, for Richard Reizen.

Joel Hirschhorn, Coral Gables, FL, for Robert Ehrling.

Kendall Coffey, U.S. Attorney, Norman Moscowitz, Miami, FL, Linda Collins Hertz and Carol Herman, Asst. U.S. Attys., U.S. Attorney's Office, Miami, FL, for the U.S.

Before KRAVITCH and EDMONDSON, Circuit Judges, and EISELE*, Senior District Judge.

EDMONDSON, Circuit Judge:

This appeal is one by four defendants, formerly executives with General Development Corporation ("GDC"), who were convicted of defrauding and conspiring to defraud home buyers throughout the 1980's. Their guilt was not proved: insufficient evidence was presented that a scheme reasonably calculated to deceive persons of ordinary prudence and comprehension was devised. We reverse the convictions.

I.

In the 1950's, GDC began buying huge tracts of undeveloped land throughout Florida. Over the years, the company created nine separate Florida communities. GDC first built the infrastructure (including over 3,700 miles of paved roads) necessary to permit residential development. Then, GDC sold lots and homes in these communities; it also permitted local businesses to build on lots purchased from GDC and to sell these lots in competition with GDC. To increase the attractiveness of the communities, GDC encouraged development; for example, the company helped persuade the New York Mets to build their spring training stadium in Port St. Lucie; GDC built and landscaped utility plants; it sold land to churches at below market value; and GDC donated land for schools. The company became the single largest developer in the entire state. Today over 250,000 people live in GDC's Florida communities.

By the 1980's, GDC was selling some of its homes at significantly higher prices than independently built homes within the same neighborhoods.[1] (For example, GDC offered a home it sold for between eighty-five and one hundred thousand dollars as a prize on the "Dream House" game show; the home was later appraised at under fifty thousand dollars.) GDC blamed its prices on higher expenses: the testimony was that independent builders had much lower overhead costs than GDC. Whatever the cause of the price disparity, attempting to sell homes of similar quality in the same neighborhood at a much higher price proved problematic for GDC.

GDC was, however, still able to sell Florida homes to certain customers, mostly those residing in "snowbelt" states. GDC marketed their communities as a great place to own a second home.[2] "One stop shopping" was available for non-residents: GDC buyers could initially purchase just a lot and later

---

* Honorable Garnett Thomas Eisele, Senior U.S. District Judge for the District of Arkansas, sitting by designation.

1. Despite these high prices, GDC consistently lost money on home sales. GDC priced homes at about $70 over its cost.

2. A GDC training tape encouraged salespeople to stress that Florida, with a 77 degree average temperature, was a great place for boating, swimming and golf. The instructor also told salespeople to explain that GDC communities were "pre-planned," making the transition to a new home easier.

trade in that lot, plus any "appreciation" in the price GDC charged for that lot, as a down payment on a home. And, GDC offered in-house financing through GDV, a wholly-owned subsidiary. Florida Home Finders, a property management subsidiary, was designed to help absentee owners rent and maintain Florida property. GDC did not inform its customers that they might be paying much more for these homes than they would for a largely identical one next door.

Customers intrigued by the home sales pitch, and especially those who had already purchased building lots, were encouraged to take a "Southward Ho" trip (a "SoHo").[3] On SoHo trips, GDC would pay for the customer to travel to Florida and to visit a GDC community for a few days. SoHo travellers were shepherded about Florida by the southern salesforce, who took affirmative steps to "focus" customers on GDC homes only. If the customer remained interested,[4] GDC would have the customer enter an agreement to purchase.

GDC started prohibiting salespeople from recommending financing from entities other than GDV (the government alleged that 80 to 90 percent of buyers financed through GDV), and all financing was processed through GDV. GDV financing agreements, which were signed sometime after contracts to purchase had been made, would note that an appraisal of the property was done. This appraisal compared the home being purchased only with other homes GDC sold nationally, not those selling in the same area for less; thus, the appraisal would show GDV that the home was worth what was being paid. Never were customers shown these appraisals.[5]

Official GDC policy forbade "investment selling," that is, encouraging people to pur-

chase GDC homes as a way to make money as opposed to purchasing a home for use in Florida. And, official GDC literature and form agreements signed by buyers disclaimed the homes' investment potential; for example, a GDC customer "bill of rights" provided: "The land you are purchasing is being sold to you for future use and not as a business investment."

Despite this official policy, certain salesmen sometimes told purchasers that the homes were "safe investments." Some customers were told that rental income would exceed mortgage payments. Some salesmen falsely said that they, personally, owned GDC homes and were making money on them. And, they said that, if a customer would hang onto their homes for a year, the homes could be sold at a profit. Some of GDC's northern sales managers even encouraged these lies.[6] But, salesmen violating official company policy were supposed to be disciplined or fired. In fact, few were disciplined severely; several were retrained, fined, or demoted.

Due to the price disparity, GDC homes were not "good investments." Customers discovered that rental income was sometimes less than GDC's Florida Home Finders had promised. Some owners could find no tenants at all for significant periods. And, several GDC customers found that they could only sell their homes by asking for much less than they paid. In the mid–1980s, GDC established Housing Customer Service (HSC) to deal with customer complaints. Many "value complaints" (that is, complaints that homes were not worth as much as was paid for them) were received. Some customers also claimed that official sales tactics, such as the SoHo, put "blinders" on them.

---

**3.** Although this prosecution involved house sales, the company also encouraged customers to visit Florida before the purchase of a lot.

**4.** GDC's "no-sale" reports listed many prospective buyers who, after a SoHo, declined to buy from GDC. A reason sometimes given was that prices were too high.

**5.** Because the resale value of the home was sometimes less than the amount of money borrowed from GDV, purchasers of mortgages in the secondary market stopped buying GDV mortgag-

es. Much evidence was taken on this point. The indictment did not allege that GDV's appraisal methodology defrauded secondary lenders.

**6.** The northern salesforce also perpetrated a largely unrelated fraud by creating false documents to assist customers with obtaining financing from GDV. This "Mineola mortgage fraud" was not charged in this indictment, but extensive evidence of the defendants' response to it was admitted under Rule 404(b).

And, the company received some complaints that the salesforce had lied about the investment or income potential of GDC homes. HSC sometimes negotiated settlements with complainants, especially those who had lawyers or were particularly persistent.

Several lawsuits were filed, and GDC received bad publicity. The U.S. Attorney's office began an investigation. GDC, itself, pled guilty to fraud and established a $169 million fund to pay customers; it also filed bankruptcy per Chapter 11.[7] But, the United States also indicted the upper echelon of GDC management for fraud and conspiracy on the sale of GDC homes between 1982 and 1989. At issue in this appeal is the trial of GDC's upper management.

David Brown, a lawyer, was instrumental in the 1985 public offering of GDC, which had been a subsidiary of City Investing. After the offering (which was midway through the indictment period), Brown became Chairman of the Board. Bob Ehrling became president of GDC in 1980 and was ultimately responsible for GDC marketing. Tore DeBella began working for GDC in 1971 after serving as a soldier in Vietnam. By 1981 he had become Senior Vice President of Marketing and oversaw GDC's salesforce. Rick Reizen was Vice President of Housing and active in the sale of homes.

Defendants were each charged with 73 total counts of mail fraud, interstate transportation of persons in furtherance of a fraud, and conspiracy. Their trial lasted nine months. Brown was acquitted on 72 counts

but was convicted on one conspiracy count. He was sentenced to 5 years in jail. Ehrling was convicted on 39 counts and sentenced to 121 months in jail. DeBella was also convicted on 39 counts and was sentenced to 97 months. Reizen was convicted on one conspiracy count and sentenced to 5 years. Each was also ordered to pay $500,000 in restitution.

## II.

■ Defendants have appealed their convictions on a variety of grounds. They challenge the sufficiency of the indictment and the sufficiency of the evidence; they also challenge various rulings of the trial court.[8] We begin, and end, our discussion of this case with a review of the evidence against defendants. In general, a review of the evidence is limited to a determination of whether a reasonable juror could find guilt beyond a reasonable doubt. *U.S. v. Funt,* 896 F.2d 1288, 1292 (11th Cir.1990). All evidence should be viewed in the light most favorable to the government, with all reasonable inferences drawn in favor of supporting the verdict. *Id.*

■ In deciding this case, we will assume that the evidence establishes basically what the government says it does. First, we assume the evidence showed defendants, through their failure to discipline salespeople or otherwise, acted to authorize misrepresentations by salespeople to customers about value.[9] *See U.S. v. Krohn,* 573 F.2d 1382,

---

7. GDC's plea bargain and bankruptcy were not before the jury; we provide this information only as background.

8. Reizen adopted the post-trial evidentiary motions of his co-defendants and filed no memorandum addressing grounds unique to his case. But, the trial court ruled that there was sufficient evidence for a conviction; and on appeal the government does not assert that Reizen is precluded from raising his own evidentiary claim. Our ruling on Reizen depends on no facts unique to his case.

9. We know that no vicarious criminal liability is authorized under the mail fraud statute. *U.S. v. Toney,* 605 F.2d 200, 208 (5th Cir.1979) ("participation by a business entity in a scheme to defraud in no way necessitates a finding that officers were participants in that scheme"). In-

stead, the evidence must show that each officer, the person, "willfully participated" in the scheme. *U.S. v. Sawyer,* 799 F.2d 1494, 1502 (11th Cir.1986)

In this case, the former GDC employees testifying for the government (and who admitted lying to GDC customers) uniformly denied that defendants expressly encouraged them to lie. These witnesses also denied that they had told defendants that lies to customers were routine. And, no one suggests that defendants ever, personally, lied to customers. *Cf. Sawyer,* 799 F.2d at 1502 (principal liable for acts of salesman not "because of his position as a principal," but because he "set up, supervised and benefitted from the fraudulent sales program from its inception").

This case seems to be unlike many cases where executives affirmatively encouraged or actually told lies to customers. *See Toney,* 605 F.2d at

1386 (10th Cir.1978); *U.S. v. Gibson,* 690 F.2d 697, 701 (9th Cir.1982). These misrepresentations involved the investment potential of the homes, that is, the re-sale value of the homes or the rental income which could be derived from the homes. As we will repeat many times, no allegations exist that GDC misrepresented the quality of their homes. Second, we assume that defendants instituted, continued, or altered official GDC programs (such as the SoHo, the appraisal methodology, the lot equity trade program (the "LETA") and the housing customer service department) with the intent to disguise the investment potential of GDC homes.[10]

### III.

■ The evidence must show that the acts and intent of defendants places them in violation of the federal criminal laws. Defendants were convicted either of conspiracy to commit federal fraud or of conspiracy, mail fraud and causing the transportation of someone in furtherance of a fraud. If the proof at trial fails to show a scheme to defraud as that term is used in the federal fraud statutes, insufficient evidence exists to uphold a conviction. *U.S. v. McNeive,* 536 F.2d 1245, 1252 (8th Cir.1976).

Language from some of our earlier opinions suggests that the federal fraud statutes encompass almost any situation. In *Gregory v. United States,* for example, we wrote that fraud is deviation from conduct that is a "reflection of moral uprightness, of funda-

mental honesty, fair play and right dealing in the general and business life of members of society." 253 F.2d 104, 109 (5th Cir.1958). But, not all of the language of the judges in an opinion has the force of binding precedent.[11] And, as the Seventh Circuit has noted, such language, "cannot have been intended, and must not be taken, literally." *U.S. v. Holzer,* 816 F.2d 304, 309 (7th Cir.1987), cert. granted and judgment vacated on other grounds, 484 U.S. 807, 108 S.Ct. 53, 98 L.Ed.2d 18 (1987) (discussing our *Gregory* opinion).

■ Instead, we must closely analyze the statutory language and the facts presented in a particular case; "[t]here are no constructive offenses; and, before one can be punished, it must be shown that his case is plainly within the statute." *Fasulo v. U.S.,* 272 U.S. 620, 629, 47 S.Ct. 200, 202, 71 L.Ed. 443 (1926) (interpreting the mail fraud statute). And, the Rule of Lenity commands that where there are alternative readings of a criminal statute we are to choose the harsher only when Congress has spoken in clear and definite language. *McNally v. U.S.,* 483 U.S. 350, 358–60, 107 S.Ct. 2875, 2881, 97 L.Ed.2d 292 (1987) (applying narrowing construction to mail fraud statute). A limitless reading of the mail fraud statute could result in a kind of federal criminal common law, that is, a situation where a person could be convicted of a crime against the United States despite the conduct not

---

205 (executive met personally with distributors and substantiated misrepresentations of salespeople); *Sawyer,* 799 F.2d at 1502 (executive "instrumental in the dissemination of [a] deceptive disclosure statement"); *U.S. v. Krohn,* 573 F.2d 1382, 1388 (10th Cir.1978) (defendant approved false advertising and personally lied regarding sales of the product); *U.S. v. Gibson,* 690 F.2d 697, 700 (9th Cir.1982) (defendant "instructed ... personnel to convey false information to complaining customers"); *U.S. v. Amrep Corp.,* 560 F.2d 539, 545 (2d Cir.1977) (defendants "set[] up a fraudulent sales program, trained and instructed the salesmen, [and] prepared sales pitches widely and consistently used"); *cf. U.S. v. Roe,* 670 F.2d 956, 964–65 (11th Cir.1982) (salesman's representations admissible against supervisor).

But, because we accept for the sake of discussion the government's characterization of the evidence, we assume that the government was

able to prove that defendants actively promoted investment selling by the GDC salesforce.

10. The government's theory of prosecution was made clear in its brief: "Appellants were properly prosecuted for participating in a scheme to defraud customers by deliberately misleading them *as to the value of the homes they were buying.*" (emphasis added).

11. For binding precedent purposes, the most that can be said about our earlier fraud cases is that, under the facts presented in the particular case, the court decided whether a violation of the fraud statutes was or was not proved by the government. As Chief Justice Marshall observed, "[i]t is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used." *Cohens v. Virginia,* 19 U.S. (6 Wheat.) 264, 399, 5 L.Ed. 257 (1821).

violating an express statutory provision. *Holzer*, 816 F.2d at 309.

With these thoughts in mind, we turn to the substantive statutes upon which these convictions are based to determine whether the evidence proved a crime was committed. The mail fraud statute prohibits devising a "scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses," which is furthered by use of the mails. 18 U.S.C. § 1341; *see also, U.S. v. Funt*, 896 F.2d 1288, 1292 (11th Cir. 1990). Title 18 U.S.C. section 2314 prohibits devising a "scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses," which induces a person to travel in interstate commerce. 18 U.S.C. § 2314; *see also, U.S. v. Biggs*, 761 F.2d 184, 187 (4th Cir.1985).

 The fraud statutes cannot be said to reach only common law fraud. *See Durland v. U.S.*, 161 U.S. 306, 312–14, 16 S.Ct. 508, 511, 40 L.Ed. 709 (1896); *U.S. v. Whitmore*, 97 F.Supp. 733, 735 (S.D.Cal.1951) ("For 'the scheme to defraud' punished by the statute is more inclusive than common law 'fraud' "). Although certain elements of common law fraud need not be shown,[12] Congress did not strip the words "defraud" or "false or fraudulent pretenses" of all the meaning these words had before the statutes were enacted. For example, "puffing" or "sellers' talk" is still not actionable under the mail fraud statute. *See U.S. v. Pearlstein*, 576 F.2d 531, 540 n. 3 (3d Cir.1978) (statements that company "nationally known" and that product "among the finest ... in the world" are "not cognizable under the federal mail fraud statute."). And, probative evidence of mail fraud is the presence or absence of the traditional "badges of fraud." *Sawyer*, 799 F.2d at 1502.

 In addition, in this circuit, mail fraud requires the government to prove that a reasonable person would have acted on the representations. *See Pelletier v. Zweifel*, 921 F.2d 1465, 1498–99 (11th Cir.1991). To prove a crime, the government must show the de-

fendant intended to create a scheme "reasonably calculated to deceive persons of ordinary prudence and comprehension." *Id.* at 1498–99 (citing *U.S. v. Bruce*, 488 F.2d 1224, 1229 (5th Cir.1973)); *but see, U.S. v. Brien*, 617 F.2d 299, 311 (1st Cir.1980), and *U.S. v. Maxwell*, 920 F.2d 1028, 1036 (D.C.Cir.1990) (disagreeing with us and holding that mail fraud can lie even where only "most gullible" would be deceived). The "person of ordinary prudence" standard is an *objective standard* not directly tied to the experiences of a specific person or persons.

 In some situations, a reasonable person is always permitted to rely on the recommendations of a particular person; and, certain people must always disclose facts where nondisclosure could result in harm. This circumstance exists when there is a special relationship of trust, such as a fiduciary relationship, between people. *See Holzer*, 816 F.2d at 307 (fraud includes "the deliberate concealment of material information in a setting of fiduciary obligation."); *cf. Chiarella v. United States*, 445 U.S. 222, 228, 100 S.Ct. 1108, 1114, 63 L.Ed.2d 348 (1980) ("[o]ne who fails to disclose material information prior to the consummation of a transaction commits fraud only when under a duty to do so."); *cf. also, U.S. v. O'Malley*, 707 F.2d 1240, 1247 (11th Cir.1983) (state insurance commissioner must disclose contractual relationship). Where a relationship "fiduciary in nature" exists between a defendant and his intended victims, the federal fraud statutes are broadly interpreted and were intended by Congress to "protect the careless and the naive from lupine predators...." *U.S. v. Kreimer*, 609 F.2d 126, 131, 132 (5th Cir.1980).

 In this case, defendants were not in some kind of legal relationship with its customers which required defendants to disclose pricing structures under every circumstance. Instead, GDC and its customers were entering into an arm's length transaction; a transaction which was of considerable financial

---

12. For example, the scheme need not be successful to be unlawful; no person need actually be

defrauded. *Pelletier v. Zweifel*, 921 F.2d 1465,

**1558**

importance to the customer.[13] Under federal law, GDC (and, a fortiori, these defendants) had no general affirmative obligation to disclose the sales price disparity between its houses and its competitors' houses.

■ But, it can be criminal fraud for a seller to conceal, or even sometimes fail to disclose, information after already affirmatively misleading customers about material facts. *See Sawyer,* 799 F.2d at 1502–03 (fraudulent concealment where defendant used false disclosure statements to induce investment); *U.S. v. Funt,* 896 F.2d at 1294 (must disclose company has no intention to make payment after promising payment to customer); *Blachly v. United States,* 380 F.2d 665, 672–74, 669 (5th Cir.1967) (concealment criminal where, among other things, defendant informed customers that their signatures on documents turning out to be promissory notes were "merely for purposes of record keeping"); *U.S. v. Townley,* 665 F.2d 579, 584–85 (5th Cir.1982) (mail fraud where defendant falsely stated company had other machines in operation, showed photographs of other company's equipment and said it was his own, and so on); *cf. U.S. v. Biesiadecki,* 933 F.2d 539, 543 (7th Cir.1991) (where "government presented extensive evidence of ... affirmative misrepresentations" conviction not improperly based on mere failure to disclose).

■ We have assumed that the government demonstrated defendants approved and promoted lies about the investment potential of GDC homes.[14] Thus, maybe these representations (combined with later acts to conceal the truth about these representations) could be the basis for criminal fraud. But, again, federal criminal fraud requires proof that a person of ordinary prudence would rely on a representation or a deception. As this court explained in *Pelletier,* mail fraud requires an objective inquiry; a scheme to defraud—that is, a violation of the mail fraud statute—exists only where a reasonable person "would have acted on the misrepresentations: were the misrepresentations reasonably calculated to deceive persons of ordinary prudence and comprehension." *See Pelletier,* 921 F.2d at 1498–99. (emphasis omitted) (internal quotation marks omitted).

■ We know that—under certain circumstances—a person, outside of a fiduciary relationship, can rely on representations of future wealth or investment potential. *See U.S. v. Bruce,* 488 F.2d 1224, 1229 (5th Cir. 1973) (defendant made "impossible representations of possible wealth to potential investors"); *U.S. v. Kail,* 804 F.2d 441, 445 (8th Cir.1986) (defendant termed coins valuable investment). This circumstance—which is present in most mail fraud cases—arises where a reasonable jury could find that a

---

1498 (11th Cir.1991). And, no injury or damage must be proved.

**13.** This case is materially different from *Silverman v. U.S.,* 213 F.2d 405, 406 (5th Cir.1954). In *Silverman,* the defendant sent solicitations to customers of Southern Bell; the solicitations were intended to look like routine invoices from Southern Bell. Three hundred and fifty people, thinking that they were paying Southern Bell what they owed that company, sent in a total of seven thousand dollars. A close reading of the solicitation would have revealed that the mailing was not connected with Southern Bell.

In *Silverman* the defendant tricked his victims so they did not realize they were entering an arrangement with him and did not understand the transaction's basic nature. In this case, customers were fully aware that they were negotiating with GDC for the purchase of a home. And, in *Silverman* the victims sent in an average of twenty dollars. *The small amount involved is relevant to the level of care a prudent person*

would invest in protecting himself. Even in 1954, reasonably prudent customers of Southern Bell could be expected to pay what appeared in the ordinary course of their business to be a legitimate bill for twenty dollars. *See also, Blachly v. U.S.,* 380 F.2d 665, 671, 672 & n. 13 (5th Cir. 1967) (despite that, upon careful thought impossibility of referral selling plan would become plain, if scheme calculated to deceive reasonable person, scheme is unlawful). In this case, GDC customers were entering what they knew to be an isolated and substantial financial transaction, involving many tens of thousands of dollars.

**14.** Defendants deny that they lied or authorized lies about the investment potential of GDC homes. They also claim that there was a valid "two tier market," with independent builders selling homes in the local market and GDC selling homes "plus" the benefits of "one stop shopping" in the national market. They claim they believed selling homes in the national market at higher prices was lawful. But to get to the main issue, we pass over these contentions.

person of ordinary prudence would not know that he should not rely on these representations.

■ We conclude in the case before us now that reasonable jurors could not find that a person of ordinary prudence, about to enter into an agreement to purchase a GDC home in Florida, would rely on (that is, in the words of *Pelletier,* "act on") the seller's own affirmative representations about the value or rental income of the GDC homes.[15] Therefore, a "scheme to defraud" within the meaning of the federal criminal statutes has been not proved.

■ A "scheme to defraud" under the pertinent criminal statutes has not been proved where a reasonable juror would have to conclude that the representation is about something which the customer should, and could, easily confirm—if they wished to do so—from readily available external sources. *See Associates in Adolescent Psychiatry, S.C. v. Home Life Ins. Co.,* 941 F.2d 561, 570 (7th Cir.1991) (no scheme to defraud where "the relation between the rates offered … and those available on other investments can be checked by a quick look at the *Wall Street Journal* or the *Chicago Tribune*"); *Blount Fin. Servs. v. Walter E. Heller and Co.,* 819 F.2d 151 (6th Cir.1987) (no scheme to defraud because reliance on statement unreasonable where matter represented could have been "verified … independently" from pub-

lic information); *Caraluzzi v. Prudential Securities, Inc.,* 824 F.Supp. 1206, 1212–13 (N.D.Ill.1993) (if exercise of "ordinary intelligence" would have prevented deception, no scheme to defraud); *Compania Sud–Americana de Vapores, S.A. v. IBJ Schroder Bank & Trust Co.,* 785 F.Supp. 411, 425 (S.D.N.Y. 1992) (no scheme to defraud where person could calculate interbank interest rate from public information);[16] *cf. U.S. v. Parker,* 839 F.2d 1473, 1480–81 (11th Cir.1988) (mail fraud conviction reversed where "loose," but not "wholly unfounded" descriptions may have deceived some customers); *cf. also U.S. v. Goodman,* 984 F.2d 235, 240 (8th Cir.1993) (reversing mail fraud conviction where the "naive and imprudent" were deceived). In this case, the relevant market prices are not difficult to investigate. The essential pricing information can be obtained by nonexperts readily, for example, by a telephone call or a visit to a GDC competitor or by a look at newspaper classified ads.

■ As we have pointed out, long-established common-law fraud concepts inform—but do not control—our discussion of the evidence necessary to support a conviction under the mail fraud statute, especially in the light of the requirement that federal criminal statutes be interpreted narrowly; such case law upholds our view that the evidence in this case supports no violation of the statutes. *See Kaye v. Pawnee Const. Co., Inc.,*

---

**15.** This statement, of course, is not to say that representations about the concrete quality of GDC homes or GDC communities could not be the basis for reasonable reliance. *See U.S. v. New South Farm & Home Co.,* 241 U.S. 64, 69–73, 36 S.Ct. 505, 507–08, 60 L.Ed. 890 (1916) (cannot ascribe property "qualities which it does not possess," such as that lands are not swampy, that artesian wells were present, that schools existed and were filled, and so on). Such representations may be criminal, and statements that buying such land (that is, land which has been represented to have qualities it does not possess) was a "good investment" or would "increase in value" can rightly be part of such a fraudulent scheme. *Id.*

But, here GDC did not ascribe to their homes and communities qualities they did not possess. Customers received the kind of home they were promised; one they actually could have looked at on a SoHo or one whose floor plan they selected. GDC communities were, indeed, pre-planned,

and many people—without complaint—live in the communities today. Schools, paved roads and infrastructure existed. *Cf. U.S. v. Amrep,* 560 F.2d 539, 543 (2d Cir.1977) (fraudulent land sales where "most of the vacant lots were on unpaved roads and without utilities of any sort"). The homes and lots, in fact, have considerable value. In this case, the homes are not alleged to have hidden structural defects. The *sole* misrepresentations or "active concealment" alleged by the government are on the resale, rental income, or investment potential of these homes: questions of value. But again, we will accept that the evidence supports the determination that Defendants exaggerated the value.

**16.** Proof of a violation of the mail fraud statute can be a predicate act for purposes of Civil RICO actions. The meaning of the statutory words "scheme to defraud" does not change depending on whether the case is Civil RICO or criminal. *See Emery v. American General Finance, Inc.,* 71 F.3d 1343, 1346 (7th Cir.1995).

680 F.2d 1360, 1368 (11th Cir.1982) (no right to rely on representations as to market value under Alabama law); *Sacramento Suburban Fruit Lands Co. v. Melin*, 36 F.2d 907, 910–11 (9th Cir.1930) ("no rule that where parties to an exchange have an equal opportunity to determine value, one may neglect the opportunity and subsequently avoid the transaction merely because an inflated value is fixed by the other party" and no fraud where help valuing property "easily accessible" or found in "publications containing dependable data"); *Chiodo v. General Waterworks Corp.*, 380 F.2d 860, 867 (10th Cir.1967) (no fraud because victim "had the opportunity to have full knowledge of the true value of [the] stock"); *Simms v. Biondo*, 816 F.Supp. 814, 820, 822 (E.D.N.Y.1993) ("the doctrine of *caveat emptor* applies to real estate transactions such that a buyer has a duty to satisfy himself or herself of the quality of a bargained purchase price without trusting a seller" and "facts which are accessible as a matter of public record bar a claim of justifiable reliance necessary to sustain a cause of action for fraud."); *Gamel v. Continental Ins. Co.*, 463 S.W.2d 590, 595 (Mo.Ct.App. 1971) (no fraud about value of insured property—even though defendant represented it was worth more than 11 times what he had paid a year earlier—where plaintiff "had the opportunity" but failed to raise questions about property's value); *Reeder v. Guaranteed Foods, Inc.*, 194 Kan. 386, 399 P.2d 822, 831 (1965) (no fraud where prices of competitors available "by checking with various appliance stores, including the Montgomery Ward and Sears Roebuck catalogs").

We stress this matter is not a "sale of distant property" case: the kind where the purchaser has no chance to investigate the property's condition and value. To the contrary, GDC by SoHos and other similar programs for lot sales actively encouraged potential customers to visit Florida to inspect their GDC home or community before buying.[17] *See Sacramento Suburban Fruit*, 36 F.2d at 910 (no fraud because plaintiff "came to California to see and investigate for himself" the property); *McNabb v. Thomas*, 190 F.2d 608, 611 (D.C.Cir.1951) (no fraud where plaintiff "visited the [property] twice"); *Simms*, 816 F.Supp. at 821 (plaintiff "conducted what he considered to be a full investigation of [the property] before entering into the Contract of Sale."); *Reeder*, 399 P.2d at 830 ("an action for damages on the ground of fraud cannot ordinarily be based on representations of value [where] the property is subject to full inspection by the purchaser.").

We have also considered whether GDC could be criminally liable for preventing customers from discovering the Florida real estate market and the unattractiveness of GDC's price within that market.[18] We, in the light of the open availability of information about the sale of homes, suspect that only very rarely (if ever) could a reasonable jury find that a defendant effectively prevented the discovery of market prices for Florida homes, especially when the purchaser visited Florida in conjunction with the purchase. Important in this case, the government conceded at trial that no allegation is made that GDC ever used "illegal force" or "kidnapping" to prevent customers from investigating the housing market while on the SoHo trip. In addition, no allegation is made that customers who knew they were traveling to Florida at GDC's expense on SoHos for the express purpose of shopping for a home were barred from looking for better deals either before or after their trip to

---

17. While the government contends the SoHo was falsely touted by GDC as a good way to learn about the Florida market, that GDC encouraged its customers to come to Florida to see their property is undisputed.

18. And, we have thought about whether GDC's targeting of customers it may have thought to be naive is relevant to our analysis. *See Emery v. American General Finance*, 71 F.3d at 1347 (mail fraud exists where defendant "[t]ake[s] advantage of the vulnerable"). As we said earlier, the "person of ordinary prudence" rule is an objective standard, making the subjective thoughts and acts of specific people generally irrelevant. *See U.S. v. Goodman*, 984 F.2d 235, 240 (8th Cir.1993) ("criminal prosecution cannot be used to punish those who run promotional schemes to make money simply because some persons are more susceptible to try their luck than a more prudent recipient"). In addition, the evidence does not show GDC targeted a group of persons traditionally provided heightened protection by the law of fraud, such as the blind, the deaf or the mentally incapacitated.

Florida. Where a company pays for customers to visit, pays for their meals, provides their transportation and pays for their rooms, not every step requiring customers to discover a better bargain through the customers' own investigation is unlawful.[19] Under the circumstances in this *criminal* case, no reasonable jury could find that GDC prevented, *in a way that would make reliance on GDC's value representations reasonable,* people of ordinary prudence from discovering what houses in Florida sold for and rented for and how the price of GDC homes compared to comparable properties in Florida. *See Reeder,* 399 P.2d at 831 (no fraud because "[h]ad [plaintiff] been interested in the value of the [product] prior to making the purchase, he could readily have ascertained its value just as he did after the purchase was made.").

GDC provided its purchasers with what was promised—a home in a pre-planned Florida community. While these homes might not be "worth" as much as some buyers would want, no one disputes that these GDC homes are of considerable value; and, we stress this case is not a case where a seller promised great value but sold something actually worthless or completely unfit for the purchaser's purpose. The GDC homes are not alleged to be defective in construction and hundreds of thousands of Floridians live in GDC's communities today; tens of thousands live in GDC-built homes. Defendants exaggerated the market value of

---

19. The government's strongest proof that GDC prevented discovery of the market in a way that could generate criminal liability was the testimony of Kumari Nair, the manager of the Ramada Inn at GDC's Port Charlotte community. She testified that for a period of one month (but perhaps as long as three months) her hotel agreed to a request by a GDC sales manager that the hotel switchboard not forward calls from GDC competitors to GDC-paid-for guests staying at her hotel. And, some phones were actually removed from the customer's rooms. She also testified that GDC salespeople wished to keep literature from the guests and to keep salespeople from GDC's competitors away from the guests.

This activity went on for, at most, three months out of the eight-year indictment period. And, her hotel serviced GDC customers visiting only the Port Charlotte community: one of GDC's nine. Nair further testified that she understood that this was done because GDC was worried that her desk clerks were being bribed to release the names and room numbers of GDC guests to GDC's competitors.

In addition, she testified that outside of the Ramada, and visible upon walking out the door, was a sign for Realty One, a GDC competitor, and that the Realty One store was within walking distance from the hotel. Also, she testified that there was a bookstore (which, in the context of the question, the jury would have to conclude, carried books and newspapers discussing real estate prices) across the street from the hotel in a shopping center visible from the hotel. She also testified that her guests were not prevented by GDC from leaving the hotel. Thus, a reasonable jury could not find that GDC acted in a way to prevent a person of ordinary prudence from discovering the market value of homes sufficient to permit criminal liability.

Other testimony on "control" of SoHo customers is also insufficient. That GDC agents would drive alternate routes to their properties to avoid signs of competitors, remove real-estate literature or newspapers from guests' rooms paid for by GDC, or have their employees eat dinner with and escort SoHo trippers are, even in the aggregate, insufficient to prove that an objective reasonable person would have been prevented from readily discovering the price disparity.

The "person of ordinary prudence" standard is an objective standard not directly tied to the experiences of a specific person or a few specific persons. To prove its case the government also called about twenty dissatisfied customers. This testimony established first that GDC did not prevent customers from looking up Florida prices before or after the SoHo. The customers' testimony about actual SoHo experiences established that GDC did not make it impossible for these customers to use the telephone, to look in the yellow pages, to buy a newspaper, to decide to meet with a rival agency individually, or to leave their hotel and look around. The customers did say that they did not choose to do these things. Some said they felt they did not have the time, given the schedule of the SoHo.

By the way, some of the customer's testimony would require the conclusion that the SoHo did help customers discover the existence of the competitive market. One purchaser witness observed "For Sale" signs for GDC competitors while on the SoHo. The signs listed the competitors' phone numbers; some signs even listed a price. The customer did not call the numbers and instead paid a price tens of thousands of dollars more than the price listed on the signs. Others testified that GDC gave them newspaper articles which mentioned other builders and that they observed buildings constructed by people other than GDC.

The concrete facts, the operative facts testified to by these witnesses, do not permit a reasonable juror to find that GDC acted in a way that would block a person of ordinary prudence and diligence from the value information readily available in the market.

these homes. These homes, however, are good homes—as far as was alleged by the government, just as good as were promised by GDC—it is just that some GDC customers could have obtained a similar home for less money.

## IV.

"The law is a causeway upon which, so long as he keeps to it, a citizen may walk safely." Robert Bolt, "A Man For All Seasons" Act II, 89 (Vintage 1960) (speech of Sir Thomas More). To be free of tyranny in a free country, the causeway's edges must be clearly marked. The exercise of federal government power to criminalize conduct and thereby to coerce and to deprive persons, by government action, of their liberty, reputation and property must be watched carefully in a country that values the liberties of its private citizens. Never can we allow federal prosecutors to make up the law as they go along.[20] So, we today heed the warning of the Supreme Court and "hesitate to adopt a construction making the difference between legal and illegal conduct in the field of business relations depend upon so uncertain a test as whether prices are reasonable." *U.S. v. Trenton Potteries Co.*, 273 U.S. 392, 398, 47 S.Ct. 377, 379, 71 L.Ed. 700, 705 (1927).

Looking at the evidence in this case, our worry is that the criminal fraud statutes were used to convict four people simply for charging high prices—all allegations of misconduct in this case involved the price customers paid for their homes, not the physical qualities of these homes. The government tries to draw a distinction; they say these men were convicted for deceptions about these high prices. For us, at least in the context of home sales and of the openness of the Florida real estate market, this distinction is a distinction without meaning.

 Construing the evidence at its worst against defendants, it is true that these men behaved badly. We live in a fallen world. But, "bad men, like good men, are entitled to be tried and sentenced in accordance with law." *Green v. U.S.*, 365 U.S. 301, 309, 81 S.Ct. 653, 658, 5 L.Ed.2d 670 (1961) (Black, J. dissenting). And, the fraud statutes do not cover all behavior which strays from the ideal; Congress has not yet criminalized all sharp conduct, manipulative acts, or unethical transactions.

We might prefer that Brown, Ehrling, De-Bella and Reizen would have told these customers to shop around before buying. But, "there are ... things ... which we wish that people should do, which we like or admire them for doing, perhaps dislike or despise them for not doing, but yet admit that they are not bound to do." John Stuart Mill, *Utilitarianism* 60 (O. Piest, ed., Bobbs–Merrill 1957) (1861). Although the line between unethical behavior and unlawful behavior is sometimes blurred—especially under the federal fraud statutes—we, in the absence of clear direction from Congress, conclude that the behavior established by the government's evidence in this case is not the kind that a reasonable jury could find, in fact, violated the federal fraud statutes. Likewise, no reasonable jury could find an agreement to violate the fraud statutes. Defendants' conduct does not fall plainly within the pertinent prohibitions.

We reach none of the other assertions of error in this case, except to note that we think they might have considerable merit. We reverse the convictions and direct that the charges against these four defendants be dismissed.

REVERSED.

---

**20.** We do not hint that this prosecution was conducted in bad faith. And, we accept that the prosecutors believed they were serving justice. But, "without some objective evidence demonstrating a scheme to defraud, all promotional schemes to make money, even if 'sleazy' or 'shrewd,' would be subject to prosecution on the mere whim of the prosecutor. More is required under our criminal law." *U.S. v. Goodman*, 984 F.2d 235, 240 (8th Cir.1993). The implications of allowing the federal fraud statutes to be treated by federal prosecutors as a largely unlimited device to attack wrongdoing whenever prosecutors feel wrongdoing exists are extremely worrisome to us.

We decide nothing in this case about the criminality of the proved conduct under state law or about civil liability.