[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 29, 2003
THOMAS K. KAHN
CLERK

_____

No. 02-11265

_____

D. C. Docket No. 01-00084-CR-RV

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DAVID NEIL YEAGER,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Alabama

_____

**(May 29, 2003)**

Before BIRCH, DUBINA and KRAVITCH, Circuit Judges.

BIRCH, Circuit Judge:

We hereby VACATE our prior opinion in this case, filed on 12 March 2003, and substitute this opinion in its place.

In this case, an appeal of conviction and sentence of certain federal mail fraud offenses relating to the distribution of pharmaceuticals, we consider the proper loss calculation under U.S.S.G. § 2F1.1 when a defendant who possesses a restricted right to distribute a product fraudulently diverts that product to non-authorized buyers. We find that the appropriate focus of the loss calculation is the marginal value of the unrestricted right to distribute over the restricted right, and we find that a reasonable estimate of this value is the profit obtained by the defendant from non-authorized sales. In addition, we consider the argument that, in a conspiracy of two people, only one person's sentence may be enhanced for playing a leadership role in the offense. Rejecting this assertion, we find that each participant can be sentenced as a leader assuming that both exercise authority and control over a distinct portion of the criminal activity. On these and related issues, we **AFFIRM**.

## I. BACKGROUND

David Neal Yeager worked as the vice president of sales and marketing for Respiratory Distributors, Inc. ("Distributors"), a small company located in Foley, Alabama, whose business it was to distribute prescription drugs at wholesale prices to pharmacies or other outlets. Richard Powell, the owner of Distributors, also

owned Respiratory Druggist, Inc. ("Druggist"), a mail-order pharmacy that sold prescription drugs directly to home health patients.

Misrepresenting himself as a vice president for Druggist, Yeager contacted Boehringer Ingelheim Pharmaceuticals, Inc. ("BIPI") in March 1996 to negotiate a contract for Druggist to sell Atrovent®, a prescription drug for the treatment of respiratory conditions created and manufactured by BIPI, to Druggist's home health patients. Yeager negotiated the contract without the immediate knowledge of Powell. Under the terms of the contract, BIPI would supply Atrovent at $28.78 per box. BIPI offered Druggist this low price on Atrovent based on the understanding that it would only be resold to Druggist's home health patients, and not to other pharmacies or wholesalers.

To ensure that Druggist sold only to its home health patients, BIPI required Druggist to submit both an initial utilization report and supplemental reports every month thereafter, which would list detailed information about all patients receiving Atrovent through Druggist. Based on these utilization reports, BIPI would determine the proper amount of Atrovent to ship. Under the contract, BIPI could immediately terminate its relationship with Druggist if these reports were not filed or if any Atrovent was diverted to non-home health patients.

Powell contends he was unaware until September 1996 that any of his companies had a contract with BIPI for the distribution of Atrovent. Throughout this time period and despite the restricted distribution contemplated under the contract with BIPI, Yeager repeatedly diverted large shipments of Atrovent to unauthorized buyers. These shipments were sent to the unauthorized buyers by interstate commercial carrier. During the relevant period, the gross profit to Powell's corporations from these sales was $687,000. BIPI itself marketed Atrovent to wholesale distribution companies, like Distributors, at a price generally higher than the Druggist contract price. The crux of the fraudulent conduct in this case was that Yeager obtained Atrovent at the low price offered under the Druggist contract and then diverted the product to Distributors. Distributors then re-sold Atrovent at a market advantage, effectively undercutting BIPI's own distribution scheme.

Both the initial utilization report and the monthly utilization reports required under the contract were not submitted. By January 1997, BIPI was concerned about the reporting failures and suspected that diversion of Atrovent was occurring. In March 1997, a representative of BIPI contacted Powell to discuss BIPI's concerns and to insist on the prompt and proper disclosure of patient information. Following this contact, Yeager and Powell agreed to continue the

4

extremely profitable deception of BIPI by submitting false and fraudulent utilization reports containing the type of information that BIPI had requested. Yeager prepared and submitted the reports to BIPI. Both Yeager and Powell instructed employees of Distributors and Druggist in conduct designed to conceal their scheme – for example, by answering the shared telephone line as "RDI" to draw attention away from the Distributors operation.

In June 1997, unsatisfied with the reports, BIPI requested an on-site audit of the facilities in Foley, Alabama. Yeager and Powell were both present for and participants in the audit. The documents obtained by BIPI representatives during the audit were continuations of the Druggist/Distributors shell game; in the words of a BIPI representative, the documents were "worthless." R3 at 150. Powell ordered employees to set up rows of empty boxes in the warehouse, with boxes of Atrovent only on top, to give the appearance that their on-hand inventory of Atrovent was much larger than in reality to create the impression that Atrovent was not being diverted to other purchasers. Powell testified at trial that, had he and Yeager turned over the true inventory records, their scheme would have been revealed. Yeager planned the BIPI visit and ensured that employees followed the instructions designed to deceive the visitors.

5

After the audit, Yeager continue to remit utilization reports that did not contain accurate and complete information for the patients to which Druggist was supposedly distributing Atrovent. BIPI learned in December 1997 that the FBI was conducting a criminal investigation related to the Atrovent sales, and BIPI terminated its relationship with Druggist/Distributors the following month.

Both Yeager and Powell were indicted for their use of the mail system to further their fraudulent scheme. Yeager refused to cooperate with federal authorities and put the government to its proof. Powell pled guilty pursuant to a written plea agreement, under which he is currently serving approximately one year in prison. He cooperated with federal authorities in the investigation and testified against Yeager during a three-day trial in August 2001. A unanimous jury found Yeager guilty on seven counts of mail fraud, in violation of 18 U.S.C. § 1341, based on seven shipments of Atrovent diverted by Yeager from August 1996 to August 1997 to unauthorized customers through the mail, and of conspiracy to commit mail fraud, also in violation of 18 U.S.C. § 1341. The district court sentenced Yeager to 33 months in prison, followed by three years of supervised release, and ordered that Yeager be jointly and severally liable with his co-conspirator Powell for the payment of $687,000 in restitution to BIPI.

## II. DISCUSSION

A. Sufficiency of Evidence for Mail Fraud Conviction

Yeager argues that the evidence presented at trial cannot sustain his fraud conviction because the government failed to prove that BIPI reasonably relied on his misrepresentations. He argues that the misrepresentations made could have been easily confirmed false if BIPI had felt the need to investigate their veracity, and that BIPI's failure to do so precludes his conviction under the mail fraud statute. According to Yeager, BIPI wanted to flood the market and make as much profit as possible from Atrovent, because that drug was soon losing its patent protection. Thus, BIPI did not care whether Distributors/Druggist was adhering to the terms of the distribution contract by selling only to home health patients and could not have reasonably relied on any false information provided by Yeager as to the customer list. The government argues that reasonable reliance is not required to be proved for conviction.

We review de novo the legal question of whether sufficient evidence exists in the record to support a guilty verdict. United States v. Tinoco, 304 F.3d 1088, 1122 (11th Cir. 2002), petition for cert. filed (U.S. Dec. 2002) (No. 02-7868). "When conducting the review of the record, we view the evidence in the light most favorable to the government and resolve all reasonable inferences and credibility

7

evaluations in favor of the jury's verdict." Id. (quoting United States v. To, 144 F.3d 737, 743 (11th Cir. 1998)).  The verdict will be upheld unless no reasonable jury could have found guilt beyond a reasonable doubt.  Id.

Under 18 U.S.C. § 1341, a person who, having devised a scheme to defraud, mails any matter through the Postal Service or any commercial interstate carrier for the purpose of furthering or accomplishing that scheme, commits a federal offense punishable by fine and up to five years of imprisonment.  The federal mail fraud statute prohibits the use of the mail to further "scheme[s] . . . to defraud."  18 U.S.C. § 1341.  The use of the mail to further these schemes is a distinct evil punishable whether or not the scheme results in completed common-law fraud.  Because the statute prohibits the "scheme to defraud," the government is not required to prove all of the elements of completed common-law fraud to sustain a conviction.  Neder v. United States, 527 U.S. 1, 24-25, 119 S. Ct. 1827, 1841 (1999).

The Supreme Court in Neder identified materiality as a necessary element, and said in dicta that "[t]he common-law elements of 'justifiable reliance' and 'damages,' for example, plainly have no place in the federal fraud statutes."  527 U.S. at 24-25, 119 S.Ct. at 1841.  We have stated previously that proof of actual reliance by the victim and proof of damages are not required, United States v.

8

Brown, 79 F.3d 1550, 1557 n.12 (11th Cir. 1996) (citing Pelletier v. Zweifel, 921 F.2d 1465, 1498 (11th Cir. 1991), but we have never clearly stated that proof that the victim reasonably relied on the misrepresentation is unnecessary. In fact, our decision in Brown can be read to hold the opposite: that "a 'scheme to defraud' . . . has not been proved where a reasonable juror would have to conclude that the representation is about something which the [victim] should, and could, easily confirm – if they wished to do so – from readily available external sources." 79 F.3d at 1559.

The argument that proof of reasonable reliance is unnecessary has a logical appeal: if it is true, as we have held, that the government is not required to prove the actual reliance of the victim on the defendant's misrepresentations, then it does not make sense to require the government to prove that the non-required reliance was reasonable. On the other hand, the elements of reasonable reliance and materiality analytically overlap; both concern the expected effectiveness of the misrepresentations, and it is difficult to describe precisely which element is fulfilled by different forms of proof and argument.

As Yeager presents the reasonable reliance element, it requires proof that the particular victim in this case, armed with his or her own knowledge and experience with the situation, did not and could not easily disprove the misrepresentations

through access to held or ready information. Reasonable reliance, thus, is in this construct a subjective requirement that turns on the particularized response of the actual victim. The Supreme Court in Neder quoted the Restatement (Second) of Torts § 538 (1977) to define a material matter fundamentally as an objective test – as one that "a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction at question." 527 U.S. at 21 n.5, 119 S.Ct. at 1840 n.5. The problem, as in most attempts to apply an objective test, is in determining how many of the victim's peculiar characteristics to impute to the hypothetical reasonable man. The more characteristics we impute, and we seem to impute quite a few characteristics here in the Eleventh Circuit, the closer the materiality element approaches the supposedly distinct element of reasonable reliance.

While it might be possible to extricate distinct analytical principles from both elements and, then, determine the exact extent of necessary proof for federal fraud cases in general, it is not necessary to do so in this specific case. First, Yeager's defense at trial is better cast as a challenge to BIPI's *actual* reliance on the misrepresentations. Yeager's defense challenges the idea that BIPI ever relied on the false customer lists – according to Yeager, BIPI never cared about the customer lists because it was motivated solely by the idea of profits before

10

Atrovent's patent expired. This argument does not challenge whether BIPI, having accepted the misrepresentations, did so reasonably. It questions whether BIPI ever accepted the misrepresentations in the first place, that is, whether BIPI actually relied on the misrepresentations. We have clearly held, however, that *actual* reliance has no place in a prosecution for federal mail fraud. Pelletier, 921 F.2d at 1498.

Second, assuming that Yeager's concept of reasonable reliance is required as a necessary element of federal mail fraud, and assuming that his defense at trial qualifies as a challenge to reasonable reliance, sufficient evidence of reasonable reliance was entered at trial. BIPI's efforts to monitor the distribution of Atrovent under its contract with Druggist constituted reasonable reliance on the misrepresentations made by Yeager in the course of the scheme to defraud. On-site audits and requests for corrected and complete information by BIPI were deflected by active deception by Yeager. The type of information misrepresented, including the lists of patients to whom Druggist was supplying Atrovent, was not easily obtainable by BIPI from another source. We find BIPI's efforts to be reasonable, repeated attempts to verify the accuracy of Yeager and Druggist's representations, and the common law definition of fraud does not require them to undertake the type of rigorous investigation necessary to pierce the facade

11

presented by the defendant.  See, e.g., Restatement (Second) of Torts §§ 540, 541 (1977).

B.  Jury Instructions

Yeager also argues that the district court erred by failing to give to the jury his preferred instruction on the requirement of reasonable reliance.  "We review a district court's refusal to give a particular jury instruction for abuse of discretion." United States v. Cornillie, 92 F.3d 1108, 1109 (11th Cir. 1996) (per curiam).  The failure of a district court to give an appropriate instruction is reversible error where the requested instruction "(1) was correct; (2) was not substantially covered by the charge actually given; and (3) dealt with some point in the trial so important that failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense." United States v. Chastain, 198 F.3d 1338, 1350 (11th Cir. 1999), cert. denied sub nom. Morris v. United States, 532 U.S. 996, 121 S.Ct. 1658 (2001).

Yeager's requested instruction provided, in relevant part, that

A scheme to defraud has not been proved where reasonable jurors would have to conclude that the representation is about something which the alleged victim, Boehringer, should, and could, easily confirm – if it wished to do so – from readily available sources including information it should, and could, easily have obtained from the defendant in a timely fashion as specifically set forth in the executed agreement.

12

R1-42. The district court rejected Yeager's proposed instruction, explaining that the topic was substantially and correctly covered by its preferred charge, drawn from the Eleventh Circuit's Pattern Jury Instructions.

First, procedurally, though Yeager did object after the district court refused his proposed instruction, the grounds for objection were only that the district court mistakenly believed that the instruction was an incorrect statement of the law, R6 at 784 ("I think it's an accurate statement of the law."), and that Yeager preferred the language he used in the instruction, id. ("I like, Judge, the way [Brown] wrote it.). The district court, however, also refused the instruction on the basis that its subject matter was duplicative of the other instructions given: "I think the charge – I don't know that it really heightens the standard, but I don't think it's necessary to give it." Id. The argument surrounding Yeager's proposed instruction focused on the perceived need to tell the jury that "the person or the victim has to be viewed – that the victim is to be viewed as a person of ordinary prudence and a reasonable person." Id. at 781. The district court pointed to the standard materiality instruction, which stated that "a material fact is a fact that would be important to a reasonable person in deciding whether to engage or not engage in a particular transaction," in declaring Yeager's supplementary instruction unnecessary. Id. at 780-81. Yeager did not object or respond to this ground for refusal, and his failure

13

to do so should remove this issue from the realm of those validly heard on appeal. See United States v. Gallo-Chomorro, 48 F.3d 502, 507-08 (11th Cir. 1995) ("To preserve an issue for appeal, a general objection or an objection on other grounds will not suffice."); United States v. Dennis, 786 F.2d 1029, 1042 (11th Cir. 1986) ("To preserve an issue at trial for later consideration by an appellate court, one must raise an objection that is sufficient to apprise the trial court and the opposing party of the particular grounds upon which appellate relief will later be sought.").

In addition and as discussed supra, Yeager's defense seeks to create reasonable doubt as to BIPI's *actual* reliance on the misrepresentations. His argument essentially is that BIPI did not actually rely on any of the customer information sent by Distributors/Druggist, and this argument, presented by evidence throughout the course of the trial and specifically highlighted by counsel for Yeager in closing argument, was rejected by the jury, given their unanimous vote to convict. Even if we found that Yeager properly preserved his objection to the instructions, and even if we found the jury instructions did not sufficiently inform the jury of their requirement to find reasonable reliance, we would find this error harmless, as it did not prejudice Yeager's ability to present his defense. Yeager was permitted to argue his theory of defense, that Boehringer knew that Yeager would be selling as much Atrovent as possible to as many people as

14

possible, and that Boehringer knew and approved of the Distributors/Druggist shell game, through evidence presented during trial and through his closing argument. See R6 at 820-831. The jury could have accepted this defense and acquitted Yeager by reference to the instructions, particularly the materiality instruction. Therefore, we can find no error in the refusal of the reasonable reliance instruction.

C. Loss Enhancement

Turning to Yeager's sentencing following his conviction at trial, Yeager argues that the district court improperly enhanced his sentence based on the amount of gain flowing from his fraudulent conduct without first making the preliminary determination that some loss accrued from the conduct. Although we generally review the district court's interpretation of the United States Sentencing Guidelines de novo, the loss calculation at the heart of U.S.S.G. § 2F1.1[1] is a factual determination that we review for clear error. United States v. Toussaint, 84 F.3d 1406, 1407 (11th Cir. 1996).

Under the 2000 Guidelines, the base offense level for offenses involving fraud is 6; this base offense level is increased up to 18 levels based on the amount

---

[1] Under the current version of the Guidelines, § 2F1.1 has been incorporated into § 2B1.1.

of loss occasioned by the fraud. See U.S.S.G. § 2F1.1(a), (b) (2000).[2] Generally speaking, "[l]oss is the value of the money, property, or services unlawfully taken." U.S.S.G. § 2F1.1 comment. (n.8). Loss, as understood under the Guidelines, is often not calculable with precision; therefore, we require the district court only "make a reasonable estimate of the loss, given the available information." U.S.S.G. § 2F1.1 comment. (n.9). The court, however, cannot merely speculate as to the proper amount of loss, United States v. Sepulveda, 115 F.3d 882, 890 (11th Cir. 1997), and, if the amount suggested by the government is contested, the government must support its estimate with "reliable and specific evidence." United States v. Renick, 273 F.3d 1009, 1025 (11th Cir. 2001) (per curiam).

Yeager contends that the district court did not and could not find that BIPI suffered a loss from his fraudulent conduct, because BIPI made a substantial profit from the sale of Atrovent to Druggist. The government responds, and the district

---

[2] The district court used the 2000 edition of the Sentencing Guidelines to sentence Yeager, given the ex post facto concerns inherent in applying more recent versions. The general rule is that a defendant is sentenced under the version of the Guidelines in effect on the date of sentencing, barring any ex post facto concerns. United States v. Bailey, 123 F.3d 1381, 1403 (11th Cir. 1997). Yeager, sentenced on 20 February 2002, would have been sentenced under the 2001 Guidelines, including those amendments made effective on 1 November 2001. Under the 2001 Guidelines, the calculated loss would result in a 14-level enhancement of Yeager's offense level, compared to the 10-level enhancement arising under the 2000 Guidelines, the version in effect during the commission of the criminal conduct at issue. This increased penalty after the commission of the offense raises ex post facto concerns which were properly addressed by the district court's use of the 2000 Guidelines version. Therefore, all citations to the Sentencing Guidelines herein are to the 2000 version unless specifically noted.

16

court accepted, that BIPI lost profit from Yeager's diversion: Yeager wrongfully sold Atrovent to non-authorized customers, using the low contract price from BIPI to bolster sales, and BIPI was denied the opportunity to sell Atrovent through established channels to these non-authorized customers at a higher price. However, the district court found itself unable to reasonably estimate this loss, based upon conflicting and confusing accounts at trial by experts who attempted to quantify the profit shortfall.

Instead, the court found that Yeager, the defendant, and Powell, the owner of Druggist and Distributors, gained $687,000 for those corporations by their pursuit of the scheme to defraud, and the court used this gain as a proxy for loss for purposes of sentencing. The $687,000 figure represents the profit made by the corporations by selling Atrovent to non-authorized customers during the relevant conspiratorial time period – the difference between the price at which Atrovent was obtained under the legitimate contract with BIPI, and the price at which Yeager sold Atrovent to non-authorized customers.

To analyze whether the district court was correct in its sentencing determinations, we initially must decide whether BIPI suffered any "loss," as that term is understood under the Guidelines, from Yeager's conduct. "[L]oss is the value of the money, property, or services unlawfully taken." U.S.S.G. § 2F1.1

17

comment. (n.8). Yeager argues that BIPI made a substantial profit off of its relationship with Druggist/Distributors, and any loss identified by the government is opportunity-cost loss, loss based on the victim's inability to use money or assets in a more profitable way because of the perpetrated fraud. Opportunity-cost loss may not be considered at sentencing: "[Loss] does not, for example, include interest the victim could have earned . . . had the offense not occurred." Id.

What "money, property, or services" were "unlawfully taken" by Yeager in this case? Though the government intimates that we should focus on the value of the diverted drugs themselves in estimating the loss, we think that a more proper focus would be on Yeager's "theft" of distribution privileges. BIPI granted Druggist the restricted right to distribute Atrovent and charged Druggist a certain price per box for that privilege. Yeager fraudulently diverted Atrovent to other purchasers, effectively converting the restrictive distribution license from BIPI into an unrestricted distribution license. Abstracted out, Yeager took the unrestricted right to distribute Atrovent. This right obviously has some value, and we agree with the district court that BIPI suffered an actual loss under the Guidelines based on the "theft" of this right. The loss calculation, therefore, should be an attempt to determine the value of the purloined portion of the distribution right – the additional benefit of unrestrained distribution stolen by Yeager through fraud.

18

The value of an unrestricted distribution right is the difference between the cost at which a distributor can obtain a product and the price at which he can re-sell that product on the market as a whole. The value of a restricted distribution right is the difference between the cost at which a distributor can obtain the product and the price at which he can re-sell that product to the restricted market. Therefore, the marginal value of the unrestricted distribution right over the restricted distribution right is the price differential between the open market and the restricted market.

It was not clear error for the district court to accept the profit made by Distributors through unrestricted sale of Atrovent during the time of the conspiracy as a reasonable estimate of the marginal value of the purloined right.[3] Distributors' profit would be expected to correlate with the profit BIPI could have made through its own sales of Atrovent to these non-authorized purchasers.

---

[3] Accepting the gross profit from unauthorized sales as an estimate of the marginal value of the unrestricted distribution right presumes that the value of Atrovent on the restricted market is very low or zero. In this case, the restricted market (Druggist's legitimate home health patients) could absorb only a certain amount of Atrovent. After the exhaustion of legitimate patients, the value of Atrovent on the restricted market is zero; there are no customers remaining to whom Druggist legitimately could sell Atrovent at any price. Therefore, the marginal value of the unrestricted right to distribute, or, at least, a reasonable estimate of the value based on the evidence presented to the district court, is the entire profit made by Yeager/Distributors on the open market, with a set-off of zero representing the value of Atrovent on the exhausted restrictive market.

Though we perhaps approach the issue in a manner different than the district court, in that we use the $687,000 figure as a direct estimate of the value of the property taken through fraud, rather than as an estimate of gain from the scheme to be used as a proxy for such value, we cannot fault the result at sentencing. We agree with the district court that the loss involved in this case was not merely an opportunity-cost loss but rather was a definite loss for which sentencing adjustments are appropriate, and, further, we agree that $687,000, the amount of profit obtained through sales of Atrovent on the unrestricted market by Distributors, is a reasonable estimate of the loss inflicted on BIPI through Yeager's fraudulent conduct. Accordingly, we find that the district court did not err in imposing a sentencing enhancement based on a loss calculation of $687,000.

D. Role Enhancement

Yeager argues that the government failed to prove that he exercised any influence or control over another participant in the conspiracy and that, therefore, his sentence cannot be increased for playing an aggravating role under the Guidelines. According to Yeager, because only he and Powell were indicted for the conduct at issue, and because Powell had already received a role enhancement for his involvement, it is inconceivable that Yeager also could be eligible for the enhancement.

20

We review the sentencing court's factual findings for clear error and its application of the sentencing guidelines to those facts de novo. United States v. Humber, 255 F.3d 1308, 1311 (11th Cir. 2001). The government bears the burden of proving by a preponderance of the evidence that the defendant had an aggravating role in the offense. United States v. Alred, 144 F.3d 1405, 1421 (11th Cir. 1998).

Under the Guidelines, a four-level increase in the applicable offense level is appropriate if the defendant "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). If the defendant was a "manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive," then the offense level should be increased by three. Id. at (b). When the defendant is "an organizer, leader, manager, or supervisor" in any other criminal activity (that is, any criminal activity not involving five or more participants and not extensive), then his offense level should be increased by two. Id. at (c). The district court imposed the two-level § 3B1.1(c) enhancement on Yeager.

According to the commentary, "[t]o qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor

21

of one or more other participants." U.S.S.G. § 3B1.1 comment. (n.2). Yeager latches onto this commentary as support for his argument that, in a conspiracy of two people, only one can be sentenced for a leadership role. However, we do not think this argument flows from the commentary. When a conspiracy involves only two participants, each participant can be a "organizer, leader, manager, or supervisor" in the criminal conduct when each participant takes primary responsibility for a distinct component of the plan and exercises control or influence over the other participant with respect to that distinct component of the plan. The record is replete with instances from which the district court could have concluded that Yeager directed or organized or led Powell in the conduct of certain elements of the criminal scheme. Even more telling, the record indicates that Yeager directed other employees of Druggist and Distributors to undertake tasks designed to further the scheme.

In addition, the fact that Powell may have received an adjustment at his sentencing does not require us to depart from an independent consideration of the propriety of an enhancement for Yeager. We are quite sure that Yeager's participation in the scheme, as proved at trial, highlights the leadership role he played in the plan to defraud BIPI, regardless of the result of Powell's sentencing.

We find no error in the district court's imposition of a two-level enhancement based on that leadership role.

E. Restitution Order

Finally, Yeager contends that the district court imposed a restitution order without any evidence of an identifiable victim who suffered loss or any finding that Yeager had the ability to pay. A district court's restitution order is generally reviewed for abuse of discretion, but the legality of that order is reviewed de novo. United States v. Davis, 117 F.3d 459, 462 (11th Cir. 1997). As we have discussed, there is evidence of a loss suffered by BIPI and attributable to Yeager's fraudulent conduct. Accordingly, we find no merit in Yeager's argument that there was no identifiable victim on which to predicate a restitution order.

As to Yeager's argument that the district court erred by failing to take into account his ability to pay restitution, we note that restitution is mandatory, without regard to a defendant's ability to pay, when the crimes of conviction are fraud- or deceit-based offenses under Title 18 of the United States Code. 18 U.S.C. § 3663A. Yeager was convicted of mail fraud and conspiracy to commit fraud in violation of 18 U.S.C. §§ 1341 and 1343, and these offenses are of the type for which mandatory restitution is appropriate under § 3663A. Therefore, the district

court did not err in failing to take Yeager's financial situation into account before ordering restitution.

## III. CONCLUSION

We conclude that the government submitted adequate proof of reasonable reliance to sustain Yeager's conviction, and that Yeager failed to properly preserve the grounds for his objection to the refusal of the reasonable reliance instruction. In addition, we find that the profits made on the open market are a reasonable estimate of the value of a stolen right to unrestricted distribution; therefore, Yeager's challenge of the loss calculation under U.S.S.G. § 2F1.1 fails. The district court also did not err by imposing a role enhancement and restitution order. Based on the foregoing discussion, we find no error in Yeager's conviction or sentencing. We **AFFIRM**.